Jeffery T. PEARCE, Appellant

v.

UNIVERSITY OF LOUISVILLE, BY
AND THROUGH ITS BOARD
OF TRUSTEES, Appellee

and

Stephen Derrick Hill, Appellant

v.

City of Mt. Washington, Appellee

2011-SC-000756-DG
2012-SC-000104-DG

· Supreme Court of Kentucky.

RENDERED: DECEMBER 18, 2014

Counsel for Jeffery Pearce: David Lindsay Leightty, Louisville, Benjamin S. Basil, Priddy, Cutler, Miller & Meade, PLLC.

Counsel for University of Louisville, by and through Its Board of Trustees: Craig Christman Dilger, Jeffrey August Calabrese, Stoll, Keenon, Ogden, PLLC, Louisville.

Counsel for Stephen Derrick Hill: David Duane Fuller, David D. Fuller, PLLC

Counsel for City of Mt. Washington: Patsey Ely Jacobs, Charles David Cole, Derrick Thomas Wright, Sturgill, Turner, Barker & Moloney, PLLC, Lexington.

Counsel for Amicus Curiae—Kentucky State Lodge, Fraternal Order of Police, Inc., Fraternal Order of Police, River City Lodge 614: Matthew P. Lynch, Stewart, Roelandt, Craigmyle & Lynch, PLLC, Crestwood.

Counsel for Amicus Curiae—Eastern Kentucky University, Morehead State University, Northern Kentucky University, University of Kentucky, and Western Kentucky University: Scott Donald Laufenberg, Kerrick, Stivers, Coyle, PSC, Bowling Green.

Counsel for Amicus Curiae—Kentucky League of Cities': Stacey Blankenship, Denton & Keuler, LLP, Paducah.

Counsel For Amicus Curiae—The Kentucky State Lodge, Fraternal Order of Police: Stephen D. Wolnitzek, Covington,Craig M. Schneider, Ft. Mitchell, Wolnitzek, Rowekamp & Demarcus, P.S.C.

## OPINION OF THE COURT BY JUSTICE VENTERS

In this decision we review, two separate opinions of the Court of Appeals, each of which concerns the applicable scope of KRS 15.520. KRS 15.520, often referred to as the "police officer's Bill of Rights," details specific procedural rights for police officers who are accused of misconduct and are facing the disciplinary processes administratively conducted by the police agency that employs them.

We granted discretionary review of these cases because the issue they present is of significant concern to law enforcement personnel throughout the state and to the municipalities and governmental units that employ them, and is a matter we have not previously addressed. In addition to the arguments presented to this Court by the respective parties, we have

received and we have considered arguments presented, as *amicus curiae*, by the Kentucky League of Cities and a consortium of Kentucky's public universities supporting of the Court of Appeals' decisions, and we have considered arguments presented by Lodges of the Fraternal Order of Police as *amicus curiae* in opposition to the Court of Appeals' decisions.

Upon review, we conclude that as it is currently written, KRS 15.520 applies to disciplinary actions that originate from within a police department as well as to disciplinary actions initiated upon complaints from persons outside the police department. Therefore, we reverse in both cases and remand each case to the respective trial court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the case of *Jeffery T. Pearce v. University of Louisville*, 2011–SC–000756–DG, Appellant Pearce's employment as a University of Louisville campus police officer was terminated by the University's chief of police after he determined that Pearce had violated University and departmental policies on two separate occasions.[1] In *Stephen Derrick Hill v. City of Mt. Washington*, 2012–SC–000104–DG, Appellant Hill, a Mt. Washington police officer, was temporarily suspended without pay and reduced in rank upon the recommendation of the Mt. Washington police chief, Thomas Rosselli, who determined that Hill had been insubordinate by making statements critical of Rosselli's administration to other officers.

In both cases, an administrative disciplinary action was initiated against the officer as a result of allegations that arose from *within* the police department itself. In neither case was a formal complaint filed against the officer by a person from outside the department. Both officers requested an administrative review procedure consistent with KRS 15.520 and in both cases that request was denied. In Pearce's case, an administrative hearing was scheduled but Pearce's request to have an attorney present as provided under KRS 15.520(1)(h)(5) was denied. Hill's request for an administrative hearing pursuant to KRS 15.520 was denied altogether.

Each Appellant sought review of his department's disciplinary decision in the appropriate circuit court, along with a claim for damages. The Bullitt Circuit Court rejected Hill's claim upon its conclusion that KRS 15.520 does not apply "where no citizen complaint is involved." In Pearce's case, the Jefferson Circuit Court seemed to conclude that KRS 15.520 was preempted by KRS 164.830, which mandates a different disciplinary process for employees of the University of Louisville.

Each officer appealed and argued to the Court of Appeals that he was improperly denied the protections provided by the police officer's Bill of Rights. In the *Pearce* case, the Court of Appeals ruled that the procedural protections provided to the police officer by KRS 15.520 apply *only* when the disciplinary action was initiated by a "citizen's complaint," and for that reason they were unavailable to Pearce. By the term "citizen's complaint," the Court of Appeals meant a formal allegation of police

---

1. Specific details of the alleged misconduct are not material to our review, beyond the fact that the disciplinary action against Pearce originated within his own department rather than upon the complaint from a member of the general public. Pearce was charged by police department authorities with failing to respond to a fire alarm, failing to file in a timely fashion his report about the fire alarm and pursuing a motorist going the wrong way on a one-way street in violation of departmental rules.

misconduct by a person from outside the police department, as opposed to an allegation of misconduct asserted from within the department, for example, by a supervisory authority, a fellow officer, or others employed within the department.[2] The *Hill* case was decided later by a different panel of the Court of Appeals that, for the most part, simply cited the *Pearce* opinion as authority for the conclusion that Hill was not entitled to the procedural processes of KRS 15.520.

As noted above, we reverse the decisions rendered herein by the Court of Appeals, and remand each case for further proceedings consistent with this opinion. Because this case involves the construction and interpretation of statutes, we begin with a brief overview of guiding principles.

## II. GENERAL PRINCIPLES OF STATUTORY CONSTRUCTION

Statutory construction is an issue of law that we review *de novo*. Therefore, "[t]he trial court's and Court of Appeals's construction of statutes is also entitled to no deference on appeal...." *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 647 (Ky.2007) (citing *Bob Hook Chevrolet Isuzu, Inc. v. Kentucky Transportation Cabinet*, 983 S.W.2d 488, 490 (Ky.1998)).

In construing a statute, it is fundamental that our foremost objective is to determine the legislature's intent in enacting the legislation. "To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v. Louisville/Jefferson County Metro Government*, 260 S.W.3d 777, 779 (Ky.2008). Further, we construe a "statute only as

written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous...." *Western Kentucky Coal Co. v. Nall & Bailey*, 228 Ky. 76, 14 S.W.2d 400, 401–02 (1929). Therefore, when a statute is unambiguous, we need not consider extrinsic evidence of legislative intent and public policy. *County Bd. of Educ. Jefferson County v. Southern Pac. Co.*, 225 Ky. 621, 9 S.W.2d 984, 986 (1928). However, if the statutory language is ambiguous, we will look to other sources to ascertain the legislature's meaning, such as legislative history and public policy considerations. *MPM Financial Group Inc. v. Morton*, 289 S.W.3d 193, 198 (Ky.2009). Further, we "read the statute as a whole, and with other parts of the law of the Commonwealth, to ensure that our interpretation is logical in context." *Lichtenstein v. Barbanel*, 322 S.W.3d 27, 35 (Ky.2010). With these principles in mind, we now consider the scope and meaning of KRS 15.520.

## III. ANALYSIS

As reflected in the above principles, we begin our review of the issue by examining the statutory language, and if the meaning of the statute may be ascertained by the plain language of its text, we must accept that explicit expression of legislative intent. KRS 15.520 is somewhat unusual because, unlike many statutes, its opening section contains an explicit expression of the General Assembly's intention in adopting KRS 15.520. Ironically, it is that very expression of legislative intent that holds the ambiguity that led the Court of Appeals down the wrong path.

### A. Statutory Text of KRS 15.520(1)

Subsection (1) of KRS 15.520 serves as the preamble for the remainder of the

---

2. For clarity and consistency, we adopt the term "citizen's complaint" for administrative charges brought against an officer as a result of complaints filed by persons from outside the department, and will use the term "intradepartmental complaints" when referring to charges that originated from within the department.

statute, and provides, perhaps, the most informative clues for ascertaining the scope of the due process protections the legislature intended to provide police officers facing administrative discipline. It contains the following expression of legislative intent and purpose:

> In order to establish a minimum system of professional conduct of the police officers of local units of government of this Commonwealth, the following standards of conduct are stated as the intention of the General Assembly to deal fairly and set administrative due process rights for police officers of the local unit of government and at the same time providing a means for redress by the citizens of the Commonwealth for wrongs allegedly done to them by police officers covered by this section. . . .

KRS 15.520(1).

Despite the somewhat awkward phrasing, the General Assembly states that it is creating "a minimum system of professional conduct of the police officers of local units of government of this Commonwealth." *Id.* That is, it is establishing a baseline system for the investigation and hearing of complaints against police officers, and it does so simultaneously with the intention of "deal[ing] fairly and set[ting] administrative due process rights for police officers of the local unit of government" and providing "a means for redress by the citizens of the Commonwealth for wrongs allegedly done to them by police officers." *Id.* We disagree with the Court of Appeals' conclusion that KRS 15.520(1) expresses a legislative intention to provide "due process rights for police officers" only in matters based upon a "citizen's complaint" and to otherwise deny those rights to officers facing disciplinary action based upon intra-departmental complaints. The Court of Appeals' very restrictive interpretation of the statute is based upon its misconstruction of the statutory language "at the same time" and upon its abridgment of the phrase "citizens of the Commonwealth" to simply the word "citizens."

## B. The Court of Appeals Misperceived the Legislative Intent of KRS 15.520

Significantly, the statutory text of KRS 15.520 contains no explicit suggestion that the administrative due process rights provided therein are not to be available to officers confronting an intra-departmental complaint. Had that been the original intent for the statute, its inclusion would have been very simple for the legislature. For example, if it had been the legislature's intention to impose such a limit, the text could have stated that the purpose of the statute was to establish standards for "deal[ing] fairly and set[ting] administrative due process rights for police officers of the local unit of government *in situations involving a citizen's complaint.*" The better word to convey the meaning read into the statute by the Court of Appeals would have been "civilians," rather than "citizens," since even the police chiefs and police supervisory authorities complaining about the persistent tardiness of an officer are "citizens" of the Commonwealth. The word "citizen" means "a legally recognized subject or national of a state or commonwealth, either native or naturalized" and "an inhabitant of a particular town or city." New Oxford American Dictionary 316 (3d ed. 2010). The same dictionary defines "civilian" as "a person not in the armed services or the police force." *Id.* at 317. But the word "civilians" is not contained in the statute.

The dichotomy of a "citizen's complaint" vs. an intra-departmental complaint is wholly a creation of the lower courts rather than the legislature. It is fundamental that the courts "are not authorized to read

into [a] statute something that is not there." *O'Neil & Hearne v. Bray's Adm'x,* 262 Ky. 377, 90 S.W.2d 353, 355 (1936). It follows that overlaying a nondepartmental source prerequisite onto the process provided by the statute plainly violates this fundamental principle.

The Court of Appeals' misinterpretation of the legislative intent begins with its misconstruction of the "redress by the citizens" provision of KRS 15.520(1) as relating to and modifying the "administrative due process" provision, thereby creating the illusion that this antecedent section applies only in temporal conjunction with proceedings arising from a "citizen's complaint." Thus, the Court of Appeals concludes "administrative due process" rights of police officers can only be available "at the same time" that wrongs done by police officers to citizens are redressed.

A more precise reading of the plain text of the statute makes clear that the phrase "at the same time" does *not* link the "due process rights for police officers" clause to the "redress by the citizens" clause. *See* KRS 15.520(1). The statute does not say that one of the legislative purposes for the statute's enactment, "administrative due process," can be served *only* "at the same time" that a second purpose, a means for redressing wrongs to citizens is also being served. Instead, the phrase relates to the "intention of the General Assembly" to exercise its legislative prerogative to accomplish dual purposes "at the same time." The General Assembly is expressing its intention to enact a law that serves multiple purposes at the same time, not an intention to create an administrative hearing that must do two things at the same time. The statute does not say, as the Court of Appeals holds, that every administrative hearing authorized by the statute must accomplish two purposes "at the same time." It does not logically follow

that simply because *one* aspect of the legislative purpose was to allow the use of administrative hearings for redress of citizens' grievances, all other expressions of legislative intent within the same statute must be subjugated to redress of so-called "citizen's complaints."

The Court of Appeals further distorts the meaning of the statute by ignoring essential words, and instead discussing "citizens' complaints." Only by conscripting the word "citizens" from its modifying prepositional phrase, "of the Commonwealth," is the Court of Appeals able to avoid the absurdity that its reasoning would produce if it used in its opinions the complete phrase, "citizens of the Commonwealth." The difference is significant. Standing by itself, the word "citizens" fairly means members of the general public at large. But the full phrase used by the legislature, "citizens of the Commonwealth," denotes a distinct subset of the general public who are residents of Kentucky, as opposed to others who are not "citizens of the Commonwealth," but are instead citizens of another state or nation.

If the legislature intended to allow police officers to have the due process protections of KRS 15.520 only when wrongs against "citizens" were being redressed, as the Court of Appeals reasons, then we must consider the *entire* phrase and account for *all* of the words used in it. The courts are not at liberty to ignore the legislature's use of the phrase the "of the Commonwealth" to modify word "citizens." *See University of the Cumberland's v. Pennybacker,* 308 S.W.3d 668, 683 (Ky. 2010) ("Simply put, we are not free to ignore portions of statutes that are inconvenient to a particular litigant's position."). We are not free to use only the words that satisfy us, and ignore the words that do not suit our conception of what the law ought to be.

Thus, under the reasoning of the Court of Appeals and using the full phrasing given by the legislature, only police officers confronted by complaints from "citizens of the Commonwealth" would have the full panoply of rights provided by KRS 15.520. Accordingly, police officers facing a complainant who is not a "citizen of the Commonwealth" (for example, a tourist from Indiana or a non-resident University of Kentucky student from Ohio) would have none of the KRS 15.520 protections. We find it highly unlikely that the legislature would have intended to create such an absurd distinction or such a weak and narrowly-applicable bill of administrative due process rights. It is only by miscasting of the statutory language and ignoring the term "citizens of the Commonwealth" that the Court of Appeals avoids that absurdity. The better way to avoid that absurdity is to take into account all of the words used by the legislature and recognize the proper function of the phrase "at the same time."

The Court of Appeals' interpretation of the statute as applying only in the case of complaints from outside the police department produces another unreasonable result. For example, suppose that a police officer arguably used excessive force against an arrestee, and the events were witnessed by a fellow police officer and a bystander from the community. Under the Court of Appeals' interpretation, if the complaint triggering a disciplinary inquiry into the possible misconduct were to be raised by the arrestee or the bystander, the proceedings would be subject to KRS 15.520; however if the arrestee and the bystander were, for whatever reason, reticent about filing a complaint, and the complaint was instead filed by the fellow police officer, the statute would *not* apply. Indeed, the Court of Appeals' interpretation actually sets the stage for the mischief that would result when departmental authorities prefer to impose discipline unconstrained by the police officer's statutory due process rights. By simply manipulating the source of the initiating complaint, they could determine whether the subject of the inquiry, the police officer, had the due process rights outlined in KRS 15.520. We do not believe that the General Assembly intended to discriminate between a "citizen's complaint" and intra-departmental complaint, and certainly the words of the statute itself do not compel the finding of such intent.

## C. KRS 15.520 Makes No Distinction Between Administrative Disciplinary Actions for Police Officers Based Upon the Source of the Initiating Complaint or the Status of the Complainant

A clear, cohesive interpretation of the statute, harmonizing all of its parts without ignoring any of its words, is entirely possible and leads to the conclusion that the General Assembly did not create a special set of administrative due process rights that apply to police officers facing disciplinary charges arising out of a "citizen's complaint." The phrasing employed by the legislature is entirely consistent with its expressed intention to enact one statute, KRS 15.520, that provides both a process for conducting administrative disciplinary hearings of police misconduct and affords "citizens of the Commonwealth" with an administrative means to seek redress for wrongs done by police officers. While these complementary legislative objectives are accomplished by a single statute, there is no indication in the statute that the first objective is not to be made available unless the second objective is simultaneously achieved.

KRS 15.520(1) discloses the legislature's intention to establish "administrative due process rights for police officers" and cer-

tainly KRS 15.520(1)(h)-(3) enumerate a comprehensive set of such rights. An administrative disciplinary proceeding originating from an internal action is, by definition, an *administrative proceeding* in the same sense as an administrative disciplinary proceeding originating from a "citizen's complaint,"[3] and so application of the statute to an intra-departmental complaint is compatible with the legislature's express intention to "set *administrative* due process rights for police officers." KRS 15.520(1) (emphasis added). Therefore, this rather unambiguous statement of legislative intent weighs heavily against an interpretation imposing a limitation restricting application of the statute to "citizens' complaints" only. The statutory text creates no distinction between administrative hearings conducted to resolve intra-departmental complaints and administrative hearings conducted to resolve a "citizen's complaint." Accordingly, we discern no legislative intention to differentiate the administrative due process rights available in either kind of administrative hearing.

### 1. References to "complaints" and "individuals"

At various points throughout the statutory text, the legislature refers to "complaints." KRS 15.520(1)(a) addresses disciplinary charges arising out of a *complaint* alleging misconduct of a police officer. It appears to be conceded by the parties that a citizen-initiated grievance against a police officer will generally arise from some form of formal complaint. It also appears, however, that intra-departmental disciplin-

ary charges of misconduct will also arise by way of a formal accusation that is fairly characterized as a "complaint." For example, an intra-departmental hearing based upon a sexual harassment charge initiated by a fellow employee would fit within the meaning of complaint. There is no readily apparent reason why the legislature would put in place different procedural protections for these. It is equally apparent that some intra-departmental disciplinary issues will arise through the normal operation of the department.

For example, in one of the cases below, Officer Hill was informed that the police chief was recommending that he be disciplined by the mayor for his insubordination. That accusation of insubordination was a complaint. It was the functional equivalent of a complaint in a civil proceeding because it informed Hill that he was accused of misconduct that could result in adverse consequences. Based upon the broad and non-restrictive language of KRS 15.520(1)(a), we are persuaded that the statutory text favors application of the section to both citizen initiated complaints and internal complaints by an intra-departmental coworker.

The introductory section of KRS 15.520(1)(a) states as follows: "*Any complaint* taken from *any individual* alleging misconduct on the part of any police officer, as defined herein, shall be taken as follows: ...." (emphasis added). Obviously, the statute is intended to apply to *any* complaint taken from *any* individual. In context, it is clear that the term "any" is used synonymously with the term "all."[4]

---

3. Black's Law Dictionary defines an administrative proceeding as "[a] hearing, inquiry, investigation, or trial before an administrative agency, usu. adjudicatory in nature but sometimes quasi-legislative." Black's Law Dictionary 48 (8th ed. 2004).

4. We recognize that the terms "any" and "all" are not necessarily interchangeable.

*See Miles v. Dawson*, 830 S.W.2d 368, 369 (Ky.1991) (discussing the interchangeability of "any" and "all."). However, in the context of 15.520(1)(a), we construe the terms as synonymous; we can think of no one who would be included in the term "all" who would be excluded by the term "any."

Therefore, based upon the text's use of the term *any*, we discern no reason to confine the application of the term "any complaint" to only complaints initiated by "citizens" from the general public.

For a similar reason, we see no reason to limit the term *any individual* to persons outside the police department and thereby exclude employees of the police department from the definition. A fellow police officer or member of the department's administrative staff is obviously an *individual*, just the same as a member of the public is. Accordingly, this section of the statute supports an interpretation which would include complaints arising from within the police department, as well as from outside the department.

Subsections 1–3 of KRS 15.520(1)(a) state as follows:

1. If the complaint alleges criminal activity on behalf of a police officer, the allegations may be investigated without a signed, sworn complaint of the *individual;*

2. If the complaint alleges abuse of official authority or *a violation of rules and regulations of the department,* an affidavit, signed and sworn to by the complainant, shall be obtained;

3. If a complaint is required to be obtained *and the individual,* upon request, refuses to make allegations under oath in the form of an affidavit, signed and sworn to, the department may investigate the allegations, but shall bring charges against the police officer only if the department can independently substantiate the allegations absent the sworn statement of the complainant. . . .

(emphasis added). Subsections 1 and 3 refer to an *individual* which, again, pursuant to ordinary usage, does not exclude police department personnel. So these provisions apply to both complaints from persons outside the police department and complaints brought by individuals employed within the police department.

Subsection 2 pertains to complaints alleging a violation of "rules and regulations of the department," which are more likely to be discovered and reported by way of a formal complaint from *within* the police department, if only because departmental rules would be largely unknown to the general citizenry. This text, therefore, gives no support to the theory that KRS 15.520 does not apply to complaints lodged by individuals within the police department. Moreover, there is no apparent reason from the statute why the legislature that chose to confer bill of rights protections for violations of "rules and regulations of the department" would deny those protections where they may be needed most, *i.e.* complaints from supervisory authorities within the police department.

Next, subsection 4 of KRS 15.520(1)(a) provides, "Nothing in this section shall preclude a department from investigating and charging an officer both criminally and administratively." (emphasis added). The Court of Appeals interpreted this section as support for its conclusion that the statute applies only to "citizen" complaints. However, upon examination, it is seen that this section, too, cannot reasonably be so construed. If a police officer has violated a criminal statute, clearly the relevant prosecuting authority should be permitted to proceed with criminal charges regardless of how we interpret KRS 15.520. Though the due process rights contained in the statute expressly apply to criminal investigations, *see* KRS 15.520(1)(d), KRS 15.520 obviously is not intended to provide police officers with any sort of shield or immunity against criminal prosecutions not available to the general public.

In addition, the provision that "[n]othing in this section shall preclude a department

from investigating and charging an officer ... administratively" also provides no indication that the statute is intended to only apply to a "citizen's complaint." *See* KRS 15.520(1)(a)4. Indeed, a principal purpose of the statute is to codify with clarity the due process rights of police officers in the event of an administrative disciplinary proceeding. This provision hints that the legislative intent of the police officer's bill of rights is for KRS 15.520 to work in tandem with whatever *other* administrative disciplinary procedures are in place at any particular police department; that is, KRS 15.520 is not in and of itself intended to be a comprehensive system of disciplinary procedures, rather its purpose is to assure that the disciplinary procedures adopted by a particular department "deal fairly" with an accused police officer.

KRS 15.520(1)(h)(3) provides "[i]f any hearing is based upon a complaint of an individual, the individual shall be notified to appear at the time and place of the hearing by certified mail, return receipt requested." The purpose of this provision is obvious. It offers no hint that individual complainants from within the police department should be treated differently from the others situated outside the department. The absence of any rationale for distinguishing between intra-departmental complainants and citizen-complainants outside the department tends to negate any inference that the legislature intended to exclude the former from the notice requirement of KRS 15.520(1)(h)(3).

### 2. *Interaction with KRS 15.410 through 15.515*

As noted above, the first clause of KRS 15.520(1) declares that one purpose of the police officer's bill of rights is to "establish a minimum system of professional conduct of the police officers of local units of government of this Commonwealth." That

clause closely interrelates with KRS 15.520(4), which provides, in part, that "[t]he provisions of this section shall apply only to police officers of local units of government who receive funds pursuant to KRS 15.410 through 15.992." KRS 15.410 through KRS 15.515 provide for the establishment and funding of the Law Enforcement Foundation Program Fund, which, in turn, is intended to incentivize participating law enforcement agencies to require their police officers to undertake advanced training intended to educate them in "minimum standards of professional conduct." *See* KRS 15.440 (setting forth the Program's rigorous training and education curriculum). Significantly, KRS 15.520(4) directly references and incorporates KRS 15.410, which further identifies the legislature's express intent in relation to the Law Enforcement Foundation Program:

> It is the intention of the General Assembly to assure that the criminal laws of the Commonwealth are enforced fairly, uniformly and effectively throughout the state by strengthening and upgrading local law enforcement; to attract competent, highly qualified young people to the field of law enforcement and to retain qualified and experienced officers for the purpose of providing maximum protection and safety to the citizens of, and the visitors to, this Commonwealth; and to offer a state monetary supplement for local law enforcement officers while upgrading the educational and training standards of such officers.

Therefore, in interpreting KRS 15.520, we must give important consideration to the overall scheme of the legislative intent, as expressed in KRS 15.410, "to attract competent, highly qualified young people to the field of law enforcement and to retain qualified and experienced officers for the purpose of providing maximum protection and safety to the citizens."

Honoring this objective and intent, it seems, would require giving a broad and expansive reach to the police officer's bill of rights, because anything less would appear to be inconsistent with the legislature's stated objective of attracting and retaining highly qualified people to the field of law enforcement. Accordingly, we construe the opening clause of the preamble as favoring the application of the bill of rights to intra-departmental disciplinary matters.

### 3. KRS 15.520(1)(b)-(g)

KRS 15.520(1)(b) through (g) contains, in relevant part, the following provisions: [5]

(b) No threats, promises, or coercions shall be used at any time against any police officer while he or she is a suspect in a criminal *or departmental matter* . . . .

(c) No police officer shall be subjected to interrogation in a *departmental matter* involving alleged misconduct on his or her part, until forty-eight (48) hours have expired from the time the request for interrogation is made to the accused officer, in writing.

. . .

(e) Any *charge involving violation of any local unit of government rule or regulation* shall be made in writing with sufficient specificity so as to fully inform the police officer of the nature and circumstances of the alleged violation in order that he may be able to properly defend himself. . . .

(f) When a police officer has been *charged* with a *violation of departmental rules or regulations,* no public statements shall be made concerning the alleged violation by any person or persons

of the local unit of government or the police officer so charged, until final disposition of the charges. . . .

(emphasis added).

The references in these sections to "departmental matter[s]" and "violation[s] of departmental rules or regulations" is not indicative of a legislative intent to restrict the protections of the statute to "citizen" complaints. Indeed, it would seem more likely that a police officer would become a suspect in a departmental matter or be charged with violating a departmental rule or regulation based upon an internal source of information rather than a complaint from a citizen. We see no reason to suppose the legislature would intend to exclude these protections from the majority of the occasions in which they are likely to arise. There is nothing in the statutory text to indicate that due process rights afforded by KRS 15.520 would be appropriate protections in the unique case of a "citizen's complaint," but not in the case of an intra-departmental complaint.

Similarly, the legislature's use of the terms "charge" and "charged" in subsections (e) and (f) point towards application of the bill of rights to intra-departmental disciplinary matters. No rational difference can be discerned between an officer charged on a "citizen's complaint" for violating a regulation of the local government or rule of the police department, and an officer charged with the same conduct by his supervising police chief.

### 4. KRS 15.520(1)(h)

The provisions of KRS 15.520(1)(h) concern specific due process rights in the event of a hearing arising from a police disciplinary matter. The section is not

---

**5.** KRS 15.520(1)(d) provides that police officers in criminal cases have the same constitutional rights as a civilian and KRS 15.520(1)(g) contains limitations providing

that a police officer may not be compelled to speak to nongovernmental personnel as a condition of employment.

particularly instructive in ascertaining the legislative intent underlying KRS 15.520 beyond what we have already discussed; however, the following points are worth noting. The preamble of the section provides as follows:

> When a hearing is to be conducted by *any* appointing authority, legislative body, or other body as designated by the Kentucky Revised Statutes, the following administrative due process rights shall be recognized and these shall be the minimum rights afforded any police officer charged....

KRS 15.520(1)(h) (emphasis added).

The legislature's use of the expansive adjective "any" suggests that the provisions of KRS 15.520(1)(h) are to apply to a hearing whether the hearing was convened as a result of a "citizen's complaint" or an intra-departmental disciplinary proceeding. The section then lists various rights to be afforded police officers in the event of a hearing (such as time constraints, right to notice, right to counsel, right to cross-examine, and the right to subpoena witnesses) which are generic and basic enough that there would be no reason to suppose that the rights would not also be intended to apply in the case of an internally generated disciplinary proceeding. As such, these subsections likewise support an interpretation that KRS 15.520 is not intended to be limited to "citizens' complaints."

### 5. KRS 15.520(2) & KRS 15.520(3)

KRS 15.520(2) and KRS 15.520(3) address a police officer's right to appeal an adverse decision. KRS 15.520(2) provides as follows:

> *Any* police officer who shall be found guilty by *any* hearing authority of *any* charge may bring an action in the Circuit Court in the county in which the local unit of government may be located to contest the action of that hearing authority, and the action shall be tried as an original action by the court.

(emphasis added). Again, the legislature's use of the adjective "any" suggests that this provision applies to both internal disciplinary proceedings and citizen complaints. KRS 15.520(3) states as follows:

> The judgment of the Circuit Court shall be subject to appeal to the Court of Appeals. The procedure as to appeal to the Court of Appeals shall be the same as in any civil action. *As the provisions of this section relate to a minimum system of professional conduct, nothing herein shall be construed as limiting or in any way affecting any rights previously afforded to police officers of the Commonwealth by statute, ordinance, or working agreement.*

(emphasis added). The first sentence provides for an appeal from the circuit court to the Court of Appeals. The second sentence indicates that other sources of rights may provide *greater* protections than those afforded under KRS 15.520. It appears from this text that the legislature believed that the statutory protections contained in the bill of rights were intended as a *minimal* level of safeguards for police officers in disciplinary proceedings. Thus, the statute provides the least acceptable due process protections, which may sometimes even fall below the level of protections afforded through other sources, such as a police department's established disciplinary procedures. In this vein, an examination of the protections provided under KRS 15.520 discloses, as far as we can tell, no provisions so burdensome or so out of line with the efficient operation of an internal disciplinary proceeding that it would seem at all unusual to apply them to an

internal disciplinary proceeding.[6] Therefore, this text likewise supports the conclusion that the legislature intended KRS 15.520 to apply to internal disciplinary proceedings.

In summary, we find nothing in the statutory text which would limit the application of the police officer's bill of rights to only complaints lodged by a member of the public. To the contrary, the broad and sweeping language employed by the legislature, as explained above, would appear to evince a legislative intent to cover both public and internally generated complaints. An examination of the individual provisions of the bill of rights discloses that they confer police officers with no more than basic due process protections in the event of the initiation of disciplinary proceedings against them than would be expected if a principal objective of the legislation is to attract and retain outstanding citizens to serve as our first line of defense against murderers, thieves, robbers, and other criminals.

### D. Recently Proposed Legislative Amendments to KRS 15.520

The Kentucky League of Cities refers us to the 2012 proposed legislation seeking to amend KRS 15.520 to explicitly remove any doubt about whether it applies to all disciplinary proceedings. We are not persuaded that the proffer of proposed legislation to amend the statute proves anything about the existing statute. Obviously the existing statute is inartfully drafted. Rather than proposing the legislation for the purpose of *changing* the meaning of the statute by expanding its application to all administrative disciplinary matters, as the Kentucky League of Cities suggests, it is just as likely that sponsors of the proposed legislation were intent upon *clarifying* the statute to confirm its broad application to all such proceedings regardless of the source of the complaint.

We are often engage in the process of discerning the legislature's intent from the words *used* in a statute so that we can direct the application of the law as the legislature intended. We draw conclusions about legislative intent from the words *used* by the legislature, but the same cannot be said for the words *not used* by the legislature. Because we do not direct the application of bills *not* passed into law, we do not indulge in speculation about *why* a bill did not become a law, or what, among myriad reasons for which proposed legislation is rejected, proves the collective legislative intention for *not* enacting a proposed statute.

### E. KRS 15.520 is not in conflict with KRS Chapters 90, 95, 83A, and 70, and 164

The dissent's position—that KRS 15.520 applies only to civilian complaints—is based *less* upon the statutory language of KRS 15.520, and *more* upon preexisting statutory provisions contained in KRS Chapter 90 (City Civil Service); KRS Chapter 95 (City Police and Fire Departments); KRS Chapter 83A (Organization of Government in Cities); KRS Chapter 70 (Sheriffs, Constables and County Police

---

6. We are, of course, familiar with the policy-based argument posed in the *amicus* brief filed by the Kentucky League of Cities predicting the parade of horrors that would follow from the application of KRS 15.520 to routine disciplinary matters, citing for example, the inability of a police chief to ask a police officer about the reasons for tardiness. Concerns of that nature are grossly overstated. *See* KRS 15.520(1)(c). Seemingly, such inquiries would naturally be made *before* a formal accusation of misconduct since a justifiable cause for being late would negate the apparent violation of policy.

Force); and KRS Chapter 164 (State Universities and Colleges . . . .)

Referring to these provisions as the "remainder of the law," the dissent purports to "harmonize" KRS 15.520 with those provisions by application of the doctrine of *in pari materia* (in the same manner) and thereby demonstrate that KRS 15.520 applies only to civilian complaints. Obviously, as noted in the dissent, these statutes provide for somewhat different disciplinary procedures for municipal employees, including police officers, depending upon the size of the city and the form of government organization it had adopted. The dissent, therefore, concludes that we have created a conflict between KRS 15.520 and these preexisting statutes.

The dissent's reasoning is flawed and its concern is misplaced for several reasons. First, because KRS 15.520 is both the more specific and later-enacted statute, its provisions supersede and supplant any conflicting provisions (and the proposition that there even *are any* conflicts is very much in doubt) contained in these widely dispersed statutes. *Withers v. University of Kentucky*, 939 S.W.2d 340, 345 (Ky. 1997) ("[W]here two statutes concern the same or similar subject matter, the specific shall prevail over the general."); *Commonwealth v. Brasher*, 842 S.W.2d 535, 536 (Ky.App.1992) [7] ("Generally, when a later-enacted and more specific statute conflicts with an earlier-enacted and more general statute, the subsequent and specific statute will control.").

For that reason, whatever conflict could be perceived in these earlier and less specific statutes must yield to the provisions of KRS 15.520, not the other way around as the dissent would have it. And further, the so-called "conflicts" identified by the dissent are actually *not* conflicts at all. An

examination of those provisions discloses that KRS 15.520 may easily be overlain onto the existing statutory structure without disturbing the processes provided therein. The dissent greatly overstates the ardor of complying with the basic due process rights required by KRS 15.520.

Second, if, as the dissent would hold, the legislature intended for the police officer's bill of rights even in the case of a "citizen's complaint" to vary depending upon the size of the police officer's city and its form of municipal government, the legislature could easily have said so by specific language to that effect or by cross-referencing the very KRS Chapters now cited by the dissent. Much to the contrary, the entire tone and tenor of KRS 15.520 suggests *uniformity* of due process protections to police officers all across the Commonwealth, irrespective of the urban or rural nature of the local community. Indeed, the very idea of "standards," and of "set[ting] administrative due process rights," as stated in KRS 15.520(1), denotes uniformity. It is incongruous (if not unconscionable) to grant police officers in rural areas a lesser measure of due process protection than their more urban counterparts. Furthermore, this interpretation is in direct conflict with the plain language of the statute. KRS 15.520(1)(h) ("When a hearing is to be conducted by *any* appointing authority, legislative body, or other body as designated by the Kentucky Revised Statutes, the following administrative due process rights shall be recognized and these shall be the minimum rights afforded any police officer charged . . . ." (emphasis added)).

Third, the dissent takes great pains in its effort to "harmonize" KRS 15.520 with other statutes when there is no dissonance to harmonize. In so doing, the dis-

---

7. Overruled on other grounds by *Moore v.*      *Commonwealth,* 990 S.W.2d 618 (Ky.1999).

sent chooses to read the statute as inapplicable to intradepartmental complaints, thus creating a distinction within KRS 15.520 that is simply not there. The legislature is presumed to be aware of existing laws when enacting a new statute. *St. Clair v. Commonwealth*, 140 S.W.3d 510, 570 (Ky.2004). When the "police officer's bill of rights" was enacted, the legislature was well aware of the existing statutes and, if it intended to provide differing procedural protections for police officers depending upon the class of cities in which they serve it could have easily done· so. There is no facial conflict here. We presume that the legislature did not intend to create a conflict; the source of the cacophony heard by the dissent is its own attempt to harmonize an otherwise complimentary set of statutes.

### F. Our Holding is Consistent with *City of Munfordville v. Sheldon*

The dissent also relies extensively upon the case *City of Munfordville v. Sheldon*, 977 S.W.2d 497 (Ky.1998) in support of its conclusion that KRS 15.520 applies only to externally-originated civilian complaints and not to intradepartmental complaints. In *Sheldon*, the newly-elected mayor fired the police chief (Sheldon) as the result of a civilian complaint about Sheldon's investigation of a robbery. Because *Sheldon* involved a complaint that happened to originate from an individual citizen outside the police department, we specifically noted that "our opinion merely forbids a mayor or other local executive authority from receiving a citizen's complaint against a police officer, then firing the officer based on that complaint, without ever affording the officer a right to publicly defend against the complaint as required by KRS 15.520." *Id.* at 499.

And per our crystal clear language, that is *all* we held. We indicated that "[n]oth-

ing in our holding prohibits a mayor from discharging an officer at his or her discretion [pursuant to KRS 83A.080(2) ]" and we qualified that by noting that discretion was proper only so long as "the reason behind the discharge does not trigger the hearing requirement of KRS 15.520[.]" *Sheldon* simply did not address the question we now address. The holding of *Sheldon* would have been no different if the process invoked against *Sheldon* had been triggered by a complaint from within the police department. There is no indication in *Sheldon* that this Court gave any consideration at all to the weighty issue we address here.

## IV. CONCLUSION

Having concluded that KRS 15.520 applies to both disciplinary proceedings generated by citizen complaints and those initiated by intra-departmental actions, our final task is to apply our holding to the two cases under review. In each case, but for different reasons, the circuit court concluded that the officer was not entitled to an administrative hearing subject to the due process provisions of KRS 15.520, and accordingly dismissed the officers' complaints. In each case, the Court of Appeals affirmed the dismissal upon the grounds that KRS 15.520 was not applicable to the respective administrative proceedings.

For the reasons set forth above, we reverse the opinions of the Court of Appeals in the cases now before us. Accordingly, we remand the case of *Pearce v. University of Louisville*, 2011–SC–000756–DG, to the Jefferson Circuit Court for further proceedings consistent with this opinion; and we remand the case of *Hill v. City of Mt. Washington*, 2012–SC–000104–DG, to the Bullitt Circuit Court for further proceedings consistent with this opinion.

Noble and Scott, JJ., concur. Keller, J., concurs by separate opinion. Minton, C.J., dissents by separate opinion in which Abramson and Cunningham, JJ., join.

KELLER, J., CONCURRING:

As evidenced by the well-written and persuasive majority and dissenting opinions, KRS 15.520 is less than clear. However, I believe the majority interpretation is correct. Therefore, I concur with the majority opinion, and write separately for four reasons. First, as do the majority and dissent, I note that the provisions of KRS 15.520 "apply only to police officers of local units of government who receive" KLEFP funds. KRS 15.520(4). Therefore, I disagree with the dissent that the provisions of KRS 15.520 create a conflict with the otherwise existing statutory framework for providing police officers with administrative protection. The existing framework remains in place for those local units of government that choose not to receive KLEFP funds. The provisions of KRS 15.520, rather than supplanting the existing framework, created an additional framework of officer protection, one that applies only to those local units of government receiving KLEFP funds. While I recognize that all local units of government may choose to and indeed may receive KLEFP funds, I also recognize that by choosing to do so, those governmental units have also chosen to be bound by the provisions of KRS 15.520.

Second, I emphasize that KRS 15.520 is part of a broader legislative scheme meant to improve the quality of law enforcement in the Commonwealth "by providing maximum protection and safety to the citizens of, and the visitors to, this Commonwealth." KRS 15.410. To accomplish this laudatory goal, the legislature created the KLEFP, "a state monetary supplement for local law enforcement officers" to upgrade the educational and training standards of those officers. *Id.* In order to receive KLEFP funds, local governmental units must comply with certain requirements. For example, officers must be paid at least minimum wage; they must have a high school degree or its equivalent; and they must undergo a specific amount of initial and continuing training. KRS 15.440. Following the requirements of KRS 15.520 is but one more requirement.

Third, as the majority notes, the legislation is designed to "attract competent, highly qualified young people to the field of law enforcement and to retain qualified and experienced officers." Providing a unified minimum set of due process standards is an additional step toward accomplishing that goal. The dissent's limiting interpretation of KRS 15.520 is a step in the wrong direction.

Finally, I take exception to the dissent's implication that the majority opinion somehow denigrates police departments throughout the Commonwealth. Certainly, most police departments and most police officers can be trusted to act reasonably and to adhere to all statutory requirements. However, the fact is that some do not. Otherwise, we would not have the exclusionary rule nor would there be a need for the procedural framework to protect police officers that existed prior to enactment of KRS 15.520.

Based on the preceding and the well-reasoned majority opinion, I concur.

MINTON, C.J., DISSENTING:

University of Louisville Department of Public Safety Officer Jeffery Pearce and Mt. Washington Police Sergeant Stephen Hill were both disciplined by their respective police departments. Pearce's employment was terminated. Hill was suspended for five days, demoted, and given a shift reassignment.

The disciplinary process that culminated in these officers' punishments originated within their own departments, not by a complaint from a citizen. Following the imposition of their sanctions, both officers filed suit in circuit court alleging that they were entitled to the protections provided in Kentucky Revised Statutes (KRS) 15.520, colloquially referred to as the Police Officer Bill of Rights.

Both circuit courts independently held the statute to be inapplicable because the disciplinary process originated internally and the statute is only applicable when discipline is premised upon a citizen complaint. Each officer appealed and reprised his argument before the Court of Appeals. Separate Court of Appeals panels agreed with the trial courts that KRS 15.520 only applies when disciplinary proceedings are initiated by a citizen complaint; and, therefore, the protections contained in the statute were unavailable to Pearce and Hill.

I would affirm the decision of the Court of Appeals in both the Pearce and Hill cases. I reach this result because I find that interpreting KRS 15.520 as applicable only to proceedings initiated by citizen complaints is necessary to ensure a harmonious reading of all other relevant, interrelated statutes providing law enforcement officers with protections from arbitrary punishment from their employers.[1] In light of this harmonious reading, I find it clear that the legislative intent in passing KRS 15.520 was to provide members of the public with a meaningful course of redress for perceived wrongs against them by police officers. And concomitantly, the legislature provided police officers with ad-

ditional protections when disciplinary proceedings are instituted against them as a result of this newly-created framework for citizen complaints. I also disagree with the result and statutory interpretation undertaken by the majority. The majority opinion, in my view, focuses too much on the perceived dual, yet independent purposes announced in KRS 15.520(1). And, in reaching this interpretation, I find that the majority interprets the statute's use of "citizen" and "individual" in such a literal manner that an absurdity results. Most importantly, however, I find that the majority has failed to interpret the statute in light of existing law to give full meaning and effect to all parts of the law.

## I. ANALYSIS.

Pearce and Hill both argue that a proper reading of KRS 15.520 requires finding that the legislature intended the statute to provide all police officers with procedural due process rights regardless of the source that initiates the disciplinary or investigative action. By adopting this interpretation, the majority strongly relies on the supposed dual purposes of the statute, asserting that the goals mentioned in KRS 15.520(1) need not be treated as one unified goal operating only in conjunction with one another. Instead, the majority views these goals as providing citizens with an avenue of redress for transgressions against them by police and providing administrative due process rights for police officers as independently served by KRS 15.520. Beyond construing KRS 15.520(1) as having two distinct goals, the majority also focuses on the statute's use of the

---

1. *See, e.g.,* KRS 90.190 (pertaining to cities of the first class); KRS 95.450 (pertaining to second- and third-class cities and urban-county governments); KRS 95.765 (pertaining to cities of the fourth and fifth class that have adopted a civil service commission); KRS 83A. 130(9) (pertaining to cities operating under the mayor-council plan); KRS 70.030 (pertaining to deputy sheriffs in absence of a deputy sheriff merit board); and KRS 164.950 (pertaining to state university police officers).

words "citizen" and "individual" when referring to those whom the statute is intended to provide redress for and whose complaints fall within the purview of the statute. The majority construes these terms to include every possible source from which officer discipline may arise: from private citizen complaints, to complaints lodged by other police officers, to wholly-internal departmental investigations.

The majority's reading of the statute is reasonable if the statute is simply read in isolation. But more compelling is adherence to the canon of construction *in pari materia* ("in the same matter")—the doctrine that supports construing statutes together in a harmonized manner resulting in the effectiveness of all statutes.[2] Reading the statute in such a manner as to harmonize it with the remainder of the law dictates an interpretation that KRS 15.520 applies only when a citizen complaint is the source of officer discipline.

The main issue in the Pearce case, and the only issue in the Hill case, is the interpretation of KRS 15.520 and whether the rights contained in that statute apply to all police discipline or only to proceedings arising out of a citizen complaint. Statutory constriction and interpretation is an issue of law that we review de novo.[3] As a result, our present interpretation yields no deference to the interpretation of the decisions of the Court of Appeals, although an opinion that is not entitled to any precedential or deferential value may nonetheless be persuasive if logical and well-reasoned.

"[T]he cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect."[4] "To determine legislative intent, we look first to the language in the statute, giving the words their plain and ordinary meaning."[5] Only when the plain meaning of the statute's language is ambiguous do we depart from a strict reliance on the words of the legislature. When such an ambiguity is present, "we look to traditional rules of statutory construction" to assist in determining the intent of the legislature.[6] In using these canons on statutory construction, "[w]e presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes."[7] We are also mindful that we "are to avoid absurd results in construing statutes."[8]

## A. Statutory Language of KRS 15.520.

With these guiding principles in mind, we must first turn to the text of KRS 15.520. As noted by the majority, the statute is unique in that its first subsection contains a sort of preamble that appears to state the General Assembly's intention in enacting KRS 15.520. Even more unique is that much of the confusion and ambiguity regarding the interpretation of this statute is rooted in this preamble.

2. *Econ. Optical Co. v. Ky. Bd. of Optometric Exam's*, 310 S.W.2d 783, 784 (Ky.1958).

3. *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 718 (Ky.2012).

4. *MPM Fin. Group, Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky.2009); *see also* KRS 446.080(1).

5. *Richardson v. Louisville/Jefferson Cnty. Metro Gov't*, 260 S.W.3d 777, 779 (Ky.2008).

6. *Morton*, 289 S.W.3d at 198.

7. *Shawnee Telecom Res. v. Brown*, 354 S.W.3d 542, 551 (Ky.2011).

8. *Winebrenner v. Dorten*, 825 S.W.2d 836, 837 (Ky.1991) (citing *George v. Alcoholic Beverage Control Bd.*, 421 S.W.2d 569, 571 (Ky.1967)).

Subsection (1) of KRS 15.520 reads as follows:

> In order to establish a minimum system of professional conduct of the police officers of local units of government [9] of this Commonwealth, the following standards of conduct are stated as the intention of the General Assembly to deal fairly and set administrative due process rights for police officers of the local unit of government and at the same time providing a means for redress by the citizens of the Commonwealth for wrongs allegedly done to them by police officers covered by the section[.]

As previously mentioned, this subsection has been the cause of much of the consternation regarding the proper interpretation of the statute as a whole. And appropriately so, as a majority of the statute, including all of the provisions regarding pre-disciplinary rights and procedures, are subsections falling under this overarching pronouncement of legislative intent.

What is clear is that the legislature intended KRS 15.520 to "set administrative due process rights for police officers of the local unit of government" and "provid[e] a means for redress by the citizens of the Commonwealth for wrongs allegedly done to them by police officers[.]" The confusion, it seems equally clear, stems from the phrase used to adjoin these two stated goals: "at the same time." The majority asserts that the General Assembly's use of

the conjunctive phrase "at the same time" does not imply any temporal or intentional connection between the two stated goals it connects. On the other hand, University of Louisville and City of Mt. Washington argue, and the Court of Appeals so concluded, that this clause evinces the General Assembly's intent that both goals be served simultaneously. Because the plain language of the statute is equally susceptible to either reasonable interpretation, the statute is ambiguous; and we must look beyond the plain text to determine the legislature's true intent.

**B. The Legislature has Created a Logical Structure for Providing Police Officers with Varying Levels of Administrative Due Process Rights.**

The application of KRS 15.520 aside, the General Assembly has created a logical structure for providing police officers with procedural protections. This comprehensive statutory structure was first enacted long before KRS 15.520 was on the books, and it presents what may fairly be referred to as a sliding scale of procedural protections for officers. This sliding scale, described in greater detail below, is the legislature's attempt at allowing local units of government to strike a balance between police officers' need for occupational stability while acknowledging that local units of government have limited resources with which to provide employees with adminis-

---

9. At first blush, it may not appear as though the University of Louisville and other similarly-situated state universities come within the scope of KRS 15.520 because they do not appear to be "local units of government." KRS 15.420, however, defines *local unit of government* to expressly include "state or public universit[ies]." KRS 15.420(1). By its own terms, KRS 15.420 only applies to KRS 15.410–510, the statutes governing the Kentucky law enforcement foundation program fund (KLEFP). Participation in KLEFP is a prerequisite for application of KRS 15.520, KRS 15.520(4) ("The provisions of this section shall apply only to police officers of local units of government who receive funds pursuant to KRS 15.410 thorough 15.992."); and, therefore, I find that the General Assembly intended KRS 15.520 to apply to all police departments receiving KLEFP funds. As a result, I find that applying the definition of *local unit of government* contained in KRS 15.420(1) to be the most reasonable definition to apply to the phrase "local unit of government" as utilized in KRS 15.520.

trative due process protections. Because of the complexity of this overall framework and the numerous statutes involved, it is helpful to engage in a brief overview of the current state of the statutory law as it pertains to different types of localities.

### 1. Cities of the First Class.

KRS 90.120 through 90.230 mandates the creation of a civil service board and provides administrative procedures applicable to the discipline of employees of first-class cities. More specifically, KRS 90.190 provides that non-probationary employees, including police officers, can only be punished by "suspension in excess often (10) days, dismissal or demotion[ ]" after the appointing officer files a written statement detailing the reasons for such discipline with the civil service board.[10] Upon receipt of this documentation, the board is required to undertake its own investigation regarding the justification of any punishment in excess of a ten-day suspension.[11] The statute further entitles employees subject to the punishment in excess of a ten-day suspension to a "public hearing by the board" in which they are allowed to present evidence on their own behalf.[12] Employees are also provided with the right to appeal any detrimental decision of the board.[13]

10. KRS 90.190(1).

11. KRS 90.190(2).

12. KRS 90.190(1).

13. KRS 90.190(3).

14. KRS 95.450(1).

15. *id.*

16. KRS 95.450(5).

17. KRS 95.450(6) ("The legislative body shall fix the punishment of a member of the police ... by a reprimand, suspension for any length

### 2. Cities of the Second and Third Class and Urban–County Governments.

KRS 95.450 provides that members of police departments in second- or third-class cities or urban-county governments may only be "reprimanded, dismissed, suspended or reduced in grade or pay" for "inefficiency, misconduct, insubordination or violation of law or of the rules adopted by the legislative body[.]"[14] Further, such discipline may only be meted out after a hearing conducted in accordance with the statutory requirements.[15] There is, of course, a statutory exception that allows the appointing authority to suspend an officer, with or without pay, pending the required hearing.[16] Lastly, the length and types of permissible punishments are also limited by statute.[17]

### 3. Cities of the Fourth and Fifth Class.

Fourth- and fifth-class cities have the option of creating a civil service commission under KRS 95.761.[18] When a city exercises this option, KRS 95.765 becomes applicable to those cities and entitles police officers to predisciplinary administrative procedures.[19] The statutory language contained in KRS 95.765 closely tracks that contained in KRS 95.450 and provides that police officers may only be "removed from the department or reduced in grade" for "inefficiency, misconduct, insubordination

of time not to exceed six (6) months, by reducing the grade if the accused is an officer, or by combining any two (2) or more of those punishments, or by dismissal from the service.").

18. KRS 95.761(1) ("Any city of the fourth or fifth class ... may by ordinance create a civil service commission[.]").

19. KRS 95.765; *see also City of Pikeville v. May*, 374 S.W.2d 843, 844 (Ky.1964) (holding that KRS 95.765 only applies when the city has adopted a civil service commission).

or violation of law[ ] or . . . rules[.]"[20] The statute also provides that the mayor or chief of police may suspend an officer with or without pay, but no further discipline shall be levied until completion of a "trial" as provided in the statute.[21]

### 4. Mayor–Council Plan.

Cities operating under the mayor-council plan enjoy decidedly more freedom in disciplining police officers. In this system, the mayor is the sole appointing authority entrusted with the ability to appoint and remove city employees, including police officers.[22] The only limitations to the mayor's v ability to discharge a police officer are "tenure and terms of employment . . . protected by statute, ordinance or contract."[23]

### 5. Deputy Sheriffs.

Like cities of the fourth and fifth class, county governments are given the opportunity to create a deputy-sheriff merit board.[24] When a deputy-sheriff merit board is established, the sheriff may terminate a deputy "for any cause which will promote the efficiency of the department."[25] But every "dismissal, suspension, or reduction made by the sheriff" is subject to board review upon request of the deputy so disciplined.[26] Deputy-sheriff merit boards, when created, are also entrusted with the ability to independently "remove, suspend, lay off or discipline" any deputy subject to their control after "reasonable notice . . . and after a complete public hearing" in which the accused deputy has the right to be represented by counsel, present evidence on his behalf, and confront all witnesses against him.[27] When a county declines to create a deputy-sheriff merit board, the sheriff may terminate a deputy's employment at will.[28]

### 6. State University Officers.

Police officers employed by state universities or other public postsecondary education institutions are peace officers who serve at the pleasure of the institution's governing board.[29] There is no statutory alternative that provides a mechanism for granting state university officers administrative protections.

### C. Reading KRS 15.520 to Exist Harmoniously Within this Existing Statutory Framework Yields the Conclusion that KRS 15.520 was Only Intended to Apply Where Discipline was Precipitated Upon a Citizen Complaint.

Even this cursory view makes it clear that the General Assembly has created an expansive framework for providing police officers with administrative protections. It is strikingly apparent that this framework did not arise in an irrational way. The legislature took care to tailor the protections provided in this reasoned manner to allow police officers procedural rights in the context of the type and size of city by which they are employed. This sliding scale of administrative due process rights was seemingly created based on the real-

20. KRS 95.765(1)

21. KRS 95.765(2).

22. KRS 83A.130(9).

23. Id.

24. KRS 70.260.

25. KRS 70.270(1).

26. KRS 70.270(2).

27. KRS 70.273(1).

28. KRS 70.030(1).

29. KRS 164.950.

ization that larger municipalities employing larger forces require more complex administrative machinery than smaller cities and towns.

The interpretation of KRS 15.520 reached by the majority creates a conflict between KRS 15.520 and the multitude of statutes that combine to form the existing statutory structure outlined above. The majority's interpretation requires all police departments receiving funds under KLEFP[30] to provide their officers with the highest level of administrative due process required by KRS 15.520, regardless of the city's size. This effectively removes the most prominent element of the current statutory scheme: the legislature's acknowledgement that not all local units of government across the Commonwealth are capable of providing extensive administrative processes. The majority's interpretation also precludes local governments from taking advantage of many of the options that are provided in the existing statutory plan, most notably the ability to create officer review boards to provide officers with additional protections.[31] These optional enactments buttress the General Assembly's sliding scale of required administrative protections by providing a statutory structure that allows communities capable of providing their officers with greater process to do so in an organized fashion. Interpreting statutes to create these conflicts belies this Court's duty to "harmonize the interpretation of the law so as to give effect to both ... statutes if possible."[32]

The presumption that the legislature knows and understands the existing laws when enacting or amending a statute adds to my hesitation to endorse an interpretation that creates a statutory conflict.[33]

Interpreting KRS 15.520 as the majority has creates such a grave conflict between the statute and the existing statutory scheme, which the legislature is presumed to have understood when enacting KRS 15.520, gives rise to the issue of repeal by implication. This Court has previously recognized that an older statute may be implicitly repealed by a later enactment when the statutes are conflicting and no other reasonable interpretation exists.[34] This type of repeal is disfavored by courts because we presume that if the legislature intends to repeal an existing statute by enacting a conflicting statute, it will express its intent with such clarity that no doubt remains about its intention to do so.[35]

I cannot construe KRS 15.520 in such a way that would require a finding that the General Assembly intended to create such a sweeping conflict with the existing statutory pattern to render that pattern inoperative. As a result, I am compelled to conclude that KRS 15.520 was intended to supplement the rights of the existing statutory scheme by providing officers additional protections when disciplinary action

30. See KRS 15.520(4).

31. See, e.g., KRS 95.761(1) ("Any city of the fourth or fifth class ... may by ordinance create a civil service commission...."); KRS 70.260(1) ("The primary legislative body of each county may enact an ordinance creating a deputy sheriff merit board....").

32. Ledford v. Faulkner, 661 S.W.2d 475, 476 (Ky.1983).

33. St. Clair v. Commonwealth, 140 S.W.3d 510, 570 (Ky.2004).

34. Osborne v. Commonwealth, 185 S.W.3d 645, 649 (Ky.2006) ("In short, courts must use repeal by implication as a last resort when the repugnancy of the conflict can admit no other reasonable construction.").

35. Id. (citing Tipton v. Brown, 277 Ky. 625, 126 S.W.2d 1067 (1939)).

is instigated by a citizen's complaint. So I must conclude that the General Assembly's use of the phrase "at the same time" to conjoin the goals announced in KRS 15.520(1) conveys the legislature's intention that the goals only be carried out simultaneously.

The majority challenges the need to harmonize the preexisting statutory scheme with KRS 15.520 by claiming there is no dissonance and that KRS 15.520 "may easily be overlain onto the existing statutory structure without disturbing the processes provided therein." The majority does not provide any support for this assertion, nor does it explain how its interpretation of KRS 15.520 may be applied to complement the framework chronicled above.

When interpreted as the majority holds, KRS 15.520 becomes the ultimate authority concerning the administrative due process police officers are entitled to when subjected to discipline. The statutes and procedures that are described above as creating an extensive sliding scale of administrative process becomes subordinate to the authority of KRS 15.520, rendering them wholly inapplicable and, thus, superfluous. As shown above, an interpretation of statutory law that renders portions of law nugatory is contrary to our canons of statutory interpretation, and borders upon repeal by implication, which is disfavored.

The majority also argues that if a conflict is found to exist, its interpretation of KRS 15.520 should "supersede and supplant" the conflicting provisions because it is the "more specific and later-enacted statute." Although deferring to the more specific and later-enacted statute is a common statutory construction technique, as KRS 15.520 is interpreted by the majority, the statute is neither more specific nor later enacted.

First, if KRS 15.520 applies to all police-officer discipline as the majority holds, it is no more specific than the statutory scheme we explain above. All the statutes we harmonize with KRS 15.520 explicitly provide police officers administrative process rights, and some do so exclusively. A single statute that provides police officers with these rights is not more specific than a detailed statutory framework providing the same throughout varying levels of municipal government.

Second, KRS 15.520 is no longer the most recently passed statute pertaining to the due process rights of police officers. Since KRS 15.520 has taken effect, the legislature has amended a portion of the statutes that create the framework we harmonize above.[36] But these amendments do not affect the level of administrative due process rights granted to police officers in those statutes. We assume the legislature understands the law when passing or amending laws, so the legislature's amendments, without repealing the portions pertaining to the administrative rights of police officers, serves to reaffirm the continued viability of those sections, further reinforcing our obligation to ensure their continued applicability by construing conflicting statutes, such as KRS 15.520, harmoniously, if possible.

The majority also misconstrues my argument regarding the sliding scale of administrative protections outlined in the existing statutory framework. The majority charges I would hold the application of the due process rights outlined in KRS 15.520 would vary even when discipline is initiated as the result of a citizen complaint. This is incorrect. I never purport to advocate for varying levels of due process to apply when a citizen complaint triggers KRS 15.520. To the contrary, I would

**36.** KRS 95.450; KRS 95.761; KRS 164.950.

construe KRS 15.520 as creating a universal standard for police-officer due process initiated by citizen complaint. Contrary to the majority, however, I construe KRS 15.520 as being limited to citizen-complaint-initiated discipline in order to preserve the existing statutory scheme that provides varying levels of procedure for internally-initiated discipline in different sized local governments.

### D. The Plain Language of KRS 15.520 Supports this Interpretation.

The plain language of the statute, beyond the preamble already discussed, also supports interpreting the statute as applying only when triggered by a citizen's complaint. The provision that most clearly evinces the General Assembly's intent to apply KRS 15.520 only in the context of citizen complaints states that the outlined procedure does not "preclude a department from investigating and charging an officer both criminally and administratively."[37]

We search in vain for a purpose of the language expressly permitting departmental administrative investigations and charges if the statute was intended to apply to all instances of police officer discipline. Just as we are required to provide harmonious interplay between statutes, we are similarly required to give effect to all statements of the legislature and not presume any word to be meaningless.[38] In order for this explicit grant of authority allowing departments to undertake administrative investigations and prefer charges outside the procedural confines of KRS 15.520 to have any force, the statute must be construed as applying in only that limit-

ed subset of officer-discipline cases spurred by a citizen complaint.

Pearce and Hill argue that a plain reading of section (1)(h)3 provides evidence that the legislature intended KRS 15.520 to apply in all administrative disciplinary proceedings. This section reads: "If any hearing is based upon a complaint of an individual, the individual shall be notified to appear at the time and place of the hearing by certified mail, return receipt requested[.]"[39] The Appellants argue that the leading language, "[i]f any hearing is based upon a complaint of an individual," assumes that hearings covered by the statute may be based upon sources other than individual complaints; and it is, therefore, implied that the statute is meant to apply to intradepartmental disciplinary proceedings, as well. Although a purely textual analysis of this language does insinuate the interpretation suggested by Pearce and Hill, it fails to consider the role KRS 15.520(1)(a)3 plays in this scenario.

Under KRS 15.520(1)(a)3, if an individual refuses to make his complaint under oath or in the form of a sworn affidavit as required by KRS 15.520(1)(a)1–2, charges may only be brought upon the completion of a departmental investigation that yields independent substantiation of the complaining individual's unsworn claims. When this procedure culminates in a disciplinary hearing, the resulting hearing is not based upon an individual's complaint but, instead, upon the result of the departmental investigation, albeit one triggered by an individual's complaint.

When reading KRS 15.520 as a whole and giving operation to all subsections, it becomes clear that the door opened by the language in KRS 15.520(1)(h)3 that allows

---

**37.** KRS 15.520(1)(a)4

**38.** *Brooks v. Meyers,* 279 S.W.2d 764, 766 (Ky.1955).

**39.** KRS 15.520(1)(h)3.

the inference that the statutory protections were intended to apply to all disciplinary proceedings is ultimately shut by the procedure outlined in KRS 15.520(1)(a)3 that requires departments to substantiate independently any unsworn citizen complaints. Since this unifying reading of KRS 15.520(1)(h)3 and (1)(a)3 gives purpose to the otherwise vague leading language contained in subsection (1)(h)3, an inference that the statute contemplates its applicability in all disciplinary proceedings is no longer mandated or even appropriate.

Further, this statutory acknowledgement that not all complaints may come from individuals undercuts the logic employed by the majority in concluding that the reference to complaints from "individuals" in KRS 15.520(1)(a) evinces a legislative intent that KRS 15.520 is applicable to all police-officer disciplinary matters. The majority reasons that because KRS 15.520(1)(a) does not draw any distinction between complaints initiated by citizens and those coming from within a police department, the legislature intended the protections contained in KRS 15.520 to be equally applicable in all disciplinary scenarios because the complaint is nonetheless filed by an individual.

In my view, this reasoning is not entitled to the force given it by the majority because it fails to consider an entire subset of potential complaints— those stemming from institutional investigations. One may argue that the results of such institutional bodies undertaking intradepartmental investigations must nonetheless yield a complaint from an individual, but to do so would do violence to the ordinary use of the word *individual*, which is defined as "a particular being or thing as distinguished from a class, species, or collection." [40] That KRS 15.520(1)(h)3 and (1)(a)3 acknowledge the existence of complaints stemming from sources other than individuals and also provide limited circumstances in which institutionally substantiated complaints come within the scope of KRS 15.520, leads to the conclusion that the legislature did not intend KRS 15.520's administrative due process protections to have universal applicability in police discipline proceedings.

In a similar vein, I also find the majority's interpretation of the legislature's use of citizen to be too literal. As further support for its argument that all complaints against police officers were intended to fall within the purview of KRS 15.520, the majority revisits the language in the preamble. It seizes upon the language that the statute intends to provide "a means for redress by the citizens of the Commonwealth for wrongs allegedly done to them by police officers[.]" [41] The majority again reasons that when the word *citizens* is given its plain meaning, it refers to civilians, or members of the general public, with as much force as it does police officers. As a result, the majority concludes that there is no practical difference between a civilian's unlawful-use-of-force complaint and an officer's sexual-harassment complaint against a co-worker.

Although a literal definition of *citizen* would clearly encompass both civilians and police officers, I think that the majority's reasoning was led astray by focusing on only one word of the above-quoted clause. When the General Assembly announced its intent to create "a means for redress by the citizens of the Commonwealth for wrongs allegedly done to them by police

**40.** MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, 10th ed., p. 592.

**41.** KRS 15.520(1).

officers,"[42] there is necessarily an implicit divide between citizens and police officers. Yes, most, if not all, police officers serving communities across the Commonwealth will also be citizens; but KRS 15.520(1), when read as a whole, evinces the General Assembly's intent to protect civilians against transgressions by police officers, not to afford officers redress against their co-workers. It is disingenuous to interpret KRS 15.520(1)'s use of *citizens* as not including an inherent and practical distinction between citizens and police officers in this context.

Not only does a plain reading of the language in KRS 15.520 make this intended distinction apparent, logic and reason further dictate that the General Assembly intended to differentiate grievances by citizens and police officers. As acknowledged by the Fraternal Order of Police, the visibility of police officers in communities renders "police officers vulnerable to false accusations from the criminal element and others in society whose sole motivation in making these allegations is to disrupt law enforcement activities."[43] This often contentious relationship between police officers and the citizens they serve provides the logical underpinning for the legislature's intention in enacting KRS 15.520 to provide officers with additional administrative due-process protections that they otherwise may not be entitled to when allegations of misconduct are levied against them by citizens.

Indeed, when complaints against police officers are initiated internally, either by a fellow police officer or as a result of an institutional investigation, a certain level of integrity is presumed; and there is no longer the same level of emotion and vitriol that is present in officer-civilian relations. As a result of the integrity with which we rely upon our police force to uphold, officers that are internally charged with wrongful conduct are less susceptible to groundless claims driven by emotion than their counterparts that come under fire from the public.

Further, the majority's assumption that this inequitable treatment of misconduct allegations premised on the source the complaint is received from will lead police departments to manipulate the source from which they receive the initial complaint in order to escape from the due-process requirements contained in KRS 15.520 is unfounded. If we succumb to this assumption that police departments cannot be trusted to adhere to the requirements of a, statute intended to protect their officers from an unjust action, then there is a fundamental flaw in the police system that must be addressed immediately. I cannot agree with reasoning that is grounded in supposing that police departments will actively attempt to manipulate the law.

### E. Existing Case Law and Legislative Activity Also Support this Interpretation.

The only previous opportunity that this Court has had to construe KRS 15.520 occurred in *City of Munfordville v. Sheldon.*[44] The ultimate holding in that case is

---

42. KRS 15.520(1).

43. *Due Process Rights for Law Enforcement Officers*, FRATERNAL ORDER OF POLICE, http://fop.net/legislative/issues/leobr/index.shtml (last visited April 2, 2014).

44. 977 S.W.2d 497 (Ky.1998). Although the statute has been cited by this Court in two

other instances, *City of Louisville By and Through Kuster v. Milligan*, 798 S.W.2d 454 (Ky.1990); *Brown v. Jefferson Cnty. Police Merit Bd.*, 751 S.W.2d 23 (Ky.1988), the construction and application of KRS 15.520 were not in issue in those cases.

consistent with the interpretation I reach today. In *Sheldon*, the Mayor of Munfordville received a citizen's complaint taking issue with the manner in which the police chief investigated the robbery of his business.[45]. Although the citizen's complaint was properly filed with the city council, the mayor summarily terminated the chief's employment without providing a reason.[46] The aggrieved chief filed suit claiming he was entitled to the procedures established by KRS 15.520.[47]

In holding that the chief was entitled to KRS 15.520 protections, the Court expressly held that it was not construing the statute so broadly as to render statutory provisions granting the mayor discretion to terminate officers at will as superfluous.[48] Instead, the Court's narrow reading of KRS 15.520 "merely forbids a mayor or other local executive authority from receiving a citizen's complaint against a police officer, then firing the officer based on that complaint, without ever affording the officer a right to publicly defend against the complaint as required by KRS 15.520."[49] The *Sheldon* Court chose its words carefully in announcing this holding as it made clear to state that KRS 15.520 was implicated because of the citizen complaint, not because the termination was admittedly "for-cause."[50] Contrary to the majority's reading of *Sheldon*, its use of the word *merely* in its holding was intended to limit the holding to prevent encroachment of the mayor's discretionary power to terminate at-will police officers absent a citizen complaint. It was not intended as a limitation on the scope of the

Court's interpretation of KRS 15.520, as the majority posits.

It also cannot go unnoticed that an amendment was recently proposed in the General Assembly that would expressly expand the scope of KRS 15.520 to include intradepartmental disciplinary matters. There are, however, a myriad of reasons that a proposed amendment may not succeed, from legislative fear of political backlash to the legislature's belief that the statute at issue is already broad enough to include the proposed amendment. As the majority correctly notes, we are typically not interested in divining the legislature's intent in failing to pass an amendment; but, in this instance, I feel that the General Assembly's failure to enact the amendment sheds considerable light on the original legislative intent in passing KRS 15.520.

The proposed amendment, Senate Bill 169, arose on the heels of the Court of Appeals opinions in both *Pearce* and *Hill* holding that KRS 15.520 is only applicable when triggered by a citizen complaint. Not only do we presume that the legislature knew of the import of these decisions, the Legislative Research Commission's Fiscal Impact Estimate flatly states that SB 169's purpose "is to extend procedural due process rights to police officers in intradepartmental disciplinary actions."[51] The LRC further explained that "[s]everal" courts had construed KRS 15.520 to be inapplicable in purely intradepartmental matters, even going so far as to cite the Court of Appeals opinion in *Hill.*

---

45. 977 S.W.2d at 497.

46. *Id.*

47. *Id.*

48. *Id.* at 499.

49. *Id.*

50. *See id.*

51. Ky. Legislative Research Comm'n, Local Mandate Fiscal Impact Estimate, SB 169, *available at* http://www.lrc.ky.gov/record/12rs/SB169/LM.doc (last visited April 2, 2014).

Although courts can never clearly understand all of the potential reasons behind the legislature's failure to enact a statute or amendment, I find it persuasive evidence of the legislature's original intent in passing a statute when there is evidence that the General Assembly was provided the prevailing interpretation of a statute and nonetheless declines to enact an amendment. While this type of evidence is admittedly not dispositive, it cannot be overlooked.

Based on the foregoing, I find no error in interpretation by the Court of Appeals of KRS 15.520. As such, I would affirm the Court of Appeals on this issue.

Abramson and Cunningham, JJ., join.