RENDERED: MARCH 18, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0595-ME

JORDAN BOYD                                                        APPELLANT

v.
APPEAL FROM JEFFERSON FAMILY COURT
HONORABLE LAUREN ADAMS OGDEN, JUDGE
ACTION NO. 20-D-503009-001

SKYLAR WEISENBERGER                                                APPELLEE

OPINION
AFFIRMING IN PART,
REVERSING IN PART, AND
REMANDING

** ** ** ** **

BEFORE: LAMBERT, MAZE, AND L. THOMPSON, JUDGES.

MAZE, JUDGE: Jordan Boyd challenges the entry of a domestic violence order

(DVO) on the basis that appellee Skylar Weisenberger failed to satisfy the

statutory requirements for issuance of a DVO, depriving the family court of

jurisdiction to proceed. Because we are convinced that Skylar had standing to seek

a DVO under the applicable statutory requirements, we affirm that portion of the

family court order which issued an order of protection for her and her unborn child. However, we are also convinced that it was premature to make an award of temporary custody of her unborn child for whom paternity had yet to be established. Accordingly, that portion of the DVO awarding temporary custody is reversed and the case remanded for entry of an amended DVO in compliance with this Opinion.

FACTS AND PROCEDURAL BACKGROUND

On November 19, 2020, Skylar, proceeding without assistance of counsel, filed an AOC-275.1 form in the Jefferson Family Court seeking an order of protection against Jordan. The same form is utilized whether a petitioner is seeking a domestic violence order under Kentucky Revised Statutes (KRS) Chapter 403 or an interpersonal protective order under KRS Chapter 456. In her petition, Skylar stated that on November 18, 2020, Jordan had engaged in an act or acts of domestic violence and abuse, dating violence and abuse, stalking, or sexual assault, and described the basis for her petition as follows:[1]

> Jordan Boyd and I got into a argument because he has
> continuously texting my phone, and stalking me on social
> media, (including making fake accounts and have mutual
> friends watch me), just to try to get in contact with me, in
> order to persue a relationship with me. I am carrying his
> child and the respondent told me when I have our child
> he will take the baby and not let me see it. (This

---

[1] We have copied Skylar's allegations verbatim and have not corrected any spelling or grammatical errors.

statement in particular happened 3-4 weeks ago).  On the date of 11/18/2020 Jordan Boyd texted me and said "If you name the baby or do anything without my permission or without talking to me about it, ima be at your doorstep on mode.  And anybody you know can get it on god."  The respondent also stated "I'm crazy, now I'm about to be a terror ass nigga.  Now you gonna see how crazy I am, I know where you live I will ruin yo life just like your ruining mine mf I will flip yo car upside down go to jail get out and do it again.  I'M REAL FUCXXXX CRAZY NOW U GON SEE ME MF."  Jordan then proceeded to say "I fuxxxxx dare you to try and keep me out of my child's life.  If your thinking about it, and if you think I talk a lot now trust me you ain't seen shit yet, I don't care about no court or police or anything try some shit like that and I promise you your going to regret that immediately.  You literally make me want to put a gun to my head right now, I'm gonna start flipping shit."  Jordan also stated "Any nixxx you date any nixxx u bring around my kid on my brothers grave ima stomp et nixxxx face in."  All of these statements were made in response to me stating I don't want to continue a relationship, and it's my choice of whether or not I keep you up to date about my child.  I've repeatedly asked the respondent to stop the texts and threats in order to have a stress free pregnancy.  But, he hasn't stopped and clearly doesn't care about me or the well-being of our child.  He also hasn't even asked how I'm doing.  He's just getting mad because we are not together.  I'm scared for my un-born child, and I can't sleep at night because I keep thinking this pregnancy will not go as smoothly as it's supposed to due to stress.  At first I wanted him in our childs life but, now I'm not so sure of that.  I can't trust him and that scares me.  (Around 3-4 weeks ago I had to go to work and he told me he could watch my dog for a week to make things easier on me, when I got my dog back she looked very scared, depressed, and unfed.  I fed her 6 times that day).  If he's doing to treat a dog like that, a treat me like that, it scares me that he might treat our child like that.  I just want him away from me, I'm tired

> of the threats and sleepless nights. I just want him to leave me alone.

In completing the form, Skylar listed their relationship as "currently or previously in a dating relationship," describing herself as Jordan's ex-friend. She did not choose the option, "unmarried, with child in common." Skylar sought an emergency or temporary protective order to restrain Jordan from committing further acts of abuse, from making any unauthorized contact or communication with her, from going to her work location, and from disposing of her property. She also requested that the family court order him to stop threatening her.

On the same day, the family court issued an emergency protective order (EPO) finding that the allegations constituted an immediate and present danger of domestic violence and abuse. The family court also ordered the sheriff to confiscate and retain any firearms in Jordan's possession pending a hearing, which was scheduled for early December. Because of a delay in serving Jordan with summons, as well as the existence of technical, work, and medical issues, the hearing required by KRS 403.730 could not be conducted until January 5, 2021.

During a prehearing conference appearance on December 15, 2020, which Jordan could not attend due to audio issues, his attorney raised a jurisdictional issue concerning the parties' relationship, alleging that although Skylar was pregnant, Jordan and Skylar did not have a child in common for purposes of seeking a DVO. In response to Jordan's jurisdictional contention, the

-4-

family court stated that it had entered an EPO in light of Skylar's allegation that she was pregnant with his child. It also indicated that if Jordan was going to acknowledge he was the child's father, the matter would be before it in family court anyway. Counsel then informed the court that Jordan was not 100% certain that the child was his, although he had been told it was his child. The court thereafter opted to let both parties respond to the jurisdictional issue at the scheduled hearing and ordered that the terms of the EPO remain in effect until the that date.

At the January 5, 2021 hearing, the parties addressed the jurisdictional issue Jordan raised in counsel's oral motion to dismiss. Before ultimately denying Jordan's motion, the family court entered a docket order which stated that Skylar had reassured it that the unborn child was Jordan's child, as well as noting its authority to hear interpersonal protective order (IPO) petitions as well as DVO petitions.

Unfortunately, the recording of the January 5 hearing could not be located by the circuit court clerk for inclusion in the appellate record. However, in response to Jordan's motion to alter, amend, or vacate the entry of the DVO, Skylar's counsel[2] summarized in detail what occurred at the hearing. Two primary contentions were the focus of that hearing: 1) that the family court lacked

---

[2] Skylar had obtained counsel to assist at this point of the proceedings.

jurisdiction because the parties did not meet the statutory requirements for issuance of a DVO; and 2) that because paternity could not be established until after the child was born, an award of temporary custody would be improper. As outlined in Skylar's responsive pleading, the proceedings included the following:

> This Court [the family court] inquired of Petitioner whether she had any doubt that her unborn child was Respondent's, and she said she did not. [Video record] VR 01/05/21, 11:37:00. This Court rejected Respondent's claim that it lacked jurisdiction, explaining that even if Respondent was correct, the Court had joint jurisdiction over interpersonal protective orders ("IPOs"). VR 01/05/2021, 11:38:40. When Respondent's counsel asked whether the case was going to move forward as an IPO, this Court stated:
>
>> *No*, I mean, I believe that these parties, you know, I'm anticipating that they will share a minor child and that they, you know, that this child was fathered by Mr. Boyd and obviously paternity can maybe be established in the paternity action once filed but given the, you know, romantic relationship between the parties and [Ms.] Weisenberger's assurance that this is the child of Mr. Boyd, I don't, I think it would be unduly burdensome to transfer it to IPO court and then transfer it back to EPO, you know, family court. So I just think in the interest of judicial efficiency and economy, we're gonna go ahead and keep the case here where it was initially filed, **unless there's, you know, evidence to the contrary going forward**. And that's just consistent with one family one court.
>
> VR 01/05/21, 11:39:17 (emphasis added).

-6-

Respondent's counsel restated the objection for the record – that the matter could not be tried as a DVO case, asserting that the parties did not qualify under the statute. VR 01/05/21, 11:40:21. In response, the Court reiterated that it has jurisdiction over IPOs. VR 01/05/21, 11:41:15. The Court granted Respondent's motion to continue the evidentiary hearing. In conclusion, the Court stated that it was denying Respondent's motion to transfer the case to district court. VR 01/05/21, 11:47:26.

In light of medical issues concerning Jordan's counsel and to accommodate Skylar's work schedule, the family court passed the matter for hearing on January 26, 2021, at which the parties and counsel appeared virtually. Skylar affirmed the contents of the petition and provided copies of text messages beginning in November 2020. Jordan also provided copies of text messages between the parties. Due to its concern about several "red flags" in the text messages, including Jordan's suicidal ideation, the alleged mistreatment of an animal, and the damage to Skylar's television, the family court asked Skylar to enlarge upon her allegations. Skylar thereafter testified that the situation escalated when she had had enough of the text message arguments every day and told Jordan that she just wanted to co-parent. She did not think the arguing was healthy for the baby. She said Jordan would get mad and was controlling, although he had never physically harmed her. She said she had not been scared of Jordan in the past, such as when she told him she wanted to co-parent, but this changed when he started threatening to kill her and the unborn child in a text message. Upon

-7-

questioning by Jordan's attorney, Skylar stated that once he sent the text messages threatening to kill her, she was in imminent fear of physical injury. She went on to testify that Jordan never attempted to come to her home or work, and he did not contact her again after the arguments because she had blocked him and his relatives. Skylar also referred to an incident a few years previously when Jordan came to her apartment with his cousin, banged on her door, and yelled at her.

Jordan testified that he and Skylar had been in an on-and-off relationship for three years. He introduced text messages and discussed the contents of the messages. He stated that he was excited when Skylar became pregnant in September. When Skylar told him that she no longer wanted to have a relationship with him until he showed he had changed, he testified that he told her he would change. Jordan acknowledged his frustration when Skylar told him that he could not be part of the child's life. Although he said he understood Skylar's decision that he could not be a part of the child's life, he nevertheless decided that he was going to pursue custody. While Jordan agreed that his text messages were inappropriate, he stated that he never intended to act on what he said. He stated that Skylar hurt his feelings and that he would never hurt her or the unborn child. Jordan emphasized that he never had a criminal charge or DVO filed against him. He understood that Skylar did not want to have a relationship with him and stated that he took the court process seriously. Jordan testified that he understood he

could not contact Skylar anymore and said he had moved on.  He understood that once the baby was born, he could proceed through the court system without contacting Skylar.  Finally, Jordan denied not taking proper care of Skylar's dog and further testified to his belief that Skylar had only filed the DVO petition to bolster her chances of obtaining custody of the child after he told her that he wanted full custody.  In Jordan's opinion, the DVO petition was Skylar's way of getting him into the system to support her claim for custody once the child was born.

Without permitting argument of counsel, the family court orally granted a three-year no-contact DVO based on the testimony and evidence presented at the hearing.  Because the parties could not speak to each other, the court gave Skylar temporary custody of the unborn child.  After Jordan's attorney objected to the family court awarding temporary custody of a child that had not yet been born, the court noted the objection for the record, stating that since the parties could not talk, they would not be able to co-parent.  Referencing fatality factors[3]

---

[3] The family court's notation of "fatality factors (*Pettingill*)" in its handwritten order was an apparent reference to the following discussion in *Pettingill v. Pettingill*, 480 S.W.3d 920, 924 (Ky. 2015):

> [l]ethality factors or 'lethality predictors' for intimate partner violence are not facts but risk factors used by courts, law enforcement, counselors, and social scientists to evaluate the threat of domestic violence between partners.  Louise E. Graham and James E. Keller, 15 Kentucky Practice: *Domestic Relations Law* § 5:13 (West 2014); Symposium, *Death by Intimacy*: *Risk Factors*

and red flags, and the in-person imminent threat two years previously, the family court found that domestic violence had occurred and was likely to occur again. Escalating factors included the pregnancy, Jordan's jealousy, suicidal ideation, abuse of a pet, and damage to property. Jordan, through counsel, requested written findings of fact and asked the court to review the text messages he introduced. The court indicated that it had read through the text messages and did not find anything concerning on Skylar's part. It believed Jordan was the aggressor and "did not play his hand well at all."

The docket order entered on the day of the hearing included the family court's written findings:

> [Skylar and Jordan] both appeared, [Jordan] also [with] counsel. [Skylar] adopted her petition [and supplemented with] further testimony. [Jordan] was abusive to [Skylar's] dog & threatened suicide in a text. [Jordan] damaged televisions in anger. [Jordan] sends awful, threatening, aggressive texts to [Skylar] when they broke up. He's never physically harmed her but they argued a lot every day. [Jordan] is very controlling & would get angry/jealous if she got dressed up. [Jordan] would look at her phone messages. [Skylar] is currently

---

*for Domestic Violence*, 20 Pace L.Rev. 263 (2000). Common factors include: threats of homicide or suicide, or suicide attempts; history of domestic violence and violent criminal conduct; stalking; depression or other mental illness; obsessive attachment to victim; separation of parties; drug or alcohol involvement; possession or access to weapons; abuse of pets; destruction of victim's property; and access to victim and victim's family and other supporters."

pregnant w/[Jordan's child.] [Skylar] fears the birth of their [child] will escalate things, increasing her fearfulness of [Jordan]. [Jordan] did have a friend try to beat down her door and threaten her in person a few years ago (along w/[Jordan]) when he was jealous of an ex-boyfriend and showed up angry [at] her house.

The court then held:

[Skylar] is credible that she is pregnant w/[Jordan's child.] [Temporary custody] to unborn [child] awarded to [Skylar] as in [child's] best interests, b/c the parties cannot communicate. Due to the imminent threat by [Jordan] two years ago & fatality factors (Pettingill) [Skylar's] burden to show DV has occurred and likely to occur again [was met]. [Jordan's] testimony was not credible (his atty was leading the witness). [Jordan] has firearms.

In the written DVO entered that day, effective until January 25, 2024, the family court referred Jordan to a batterer's intervention program to help him be better able to co-parent later.

Jordan subsequently filed a motion to alter, amend, or vacate the DVO pursuant to Kentucky Rules of Civil Procedure (CR) 52.02 and 59.05 in which he argued that the court should have conducted an IPO hearing rather than a DVO hearing. Jordan insisted that Skylar could not be considered to be a member of an unmarried couple pursuant to the statutory definition because they did not have a child in common, arguing that Skylar was merely pregnant with a child she believed had been fathered by Jordan. He requested that the court vacate the DVO and transfer the case to the district court for an IPO hearing, which was the practice

-11-

in Jefferson County. Jordan also raised issues about service of process and his due process rights based on the court's decision to conduct a DVO hearing rather than an IPO hearing, which he had anticipated. Citing KRS 406.180, Jordan went on to argue that the court could not establish paternity of the unborn child because, under paternity law, a birth is required. Neither could Jordan acknowledge paternity under the law. In addition, Jordan argued that the written findings of fact were insufficient to support a finding of domestic violence as there was no evidence to indicate that Skylar was fearful of imminent physical injury. Finally, he argued that the leading of a witness by an attorney was not a factor that could be used to determine the credibility of a witness.

Skylar, now represented by counsel, filed a response to Jordan's motion to vacate. She argued that the court properly entered a DVO and properly held a DVO hearing, contesting Jordan's notice argument and citing Jordan's failure to contest paternity, along with his admissions that the child was his. Skylar also noted that when the court ruled on Jordan's motion to dismiss, it stated that while it found the allegations in the petition were sufficient to establish the required relationship, it allowed for the possibility that evidence may show otherwise. However, she argued that Jordan failed to do so at the hearing. Skylar contended that KRS 403.720(5) does not specify that a child must already be born to establish the status of unmarried couple, insisting that to recognize that "an

-12-

unborn child constitutes a 'child in common' for purposes of the DVO statutes is not contrary to treatment of unborn children in other contexts under Kentucky law and serves the purposes behind Kentucky's DVO statutes."

By order entered May 12, 2021, the family court denied Jordan's motion to alter, amend, or vacate. This expedited appeal followed.

As a preliminary matter, we decline Skylar's request to strike Jordan's brief due to his failure to substantially comply with CR 76.12. Despite its shortcomings, the brief contains sufficient citations to the record, an appendix containing the relevant orders on appeal, and a certificate of service stating that the record had not been removed. And while there were no statements concerning issue preservation as required by the rule, the relatively abbreviated record did not hinder a thorough review of the appeal.

STANDARD OF REVIEW

In *Clark v. Parrett*, 559 S.W.3d 872, 875 (Ky. App. 2018), this Court set forth the statutory definition of domestic violence and abuse and the appropriate standards of proof and review:

> "Domestic violence and abuse" is defined as "physical injury, serious physical injury, stalking, sexual abuse, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, or assault between family members or members of an unmarried couple[.]" Kentucky Revised Statutes (KRS) 403.720(1). "Any family member or any member of an unmarried couple may file for and receive protection . . .

-13-

from domestic violence and abuse[.]" KRS 403.750(1). "Following a hearing . . . if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur, the court may issue a domestic violence order[.]" KRS 403.740(1). "Our review in this Court is not whether we would have decided the case differently, but rather whether the trial court's findings were clearly erroneous or an abuse of discretion." *Gibson v. Campbell-Marletta*, 503 S.W.3d 186, 190 (Ky. App. 2016).

"The preponderance of the evidence standard is met when sufficient evidence establishes that the alleged victim 'was more likely than not to have been a victim of domestic violence.'" *Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (quoting *Commonwealth v. Anderson*, 934 S.W.2d 276, 278 (Ky. 1996)).

In *Caudill v. Caudill*, 318 S.W.3d 112, 114-15 (Ky. App. 2010), this Court stated:

The standard of review for factual determinations is whether the family court's finding of domestic violence was clearly erroneous. CR 52.01; *Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986). Findings are not clearly erroneous if they are supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "[I]n reviewing the decision of a trial court the test is not whether we would have decided it differently, but whether the findings of the trial judge were clearly erroneous or that he abused his discretion." *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982) (citation omitted). Abuse of discretion occurs when a court's decision is unreasonable, unfair, arbitrary or capricious. *Kuprion v. Fitzgerald*, 888 S.W.2d 679, 684 (Ky. 1994) (citations omitted).

(Footnote omitted.) The *Caudill* Court went on to recognize that:

-14-

While "domestic violence statutes should be construed liberally in favor of protecting victims from domestic violence and preventing future acts of domestic violence[,]" *Barnett v. Wiley*, 103 S.W.3d 17, 19 (Ky. 2003), "the construction cannot be unreasonable." *Id.* (citing *Beckham v. Board of Education of Jefferson County*, 873 S.W.2d 575, 577 (Ky. 1994)). Furthermore, we give much deference to a decision by the family court, but we cannot countenance actions that are arbitrary, capricious or unreasonable. *See Kuprion*, 888 S.W.2d at 684.

*Caudill*, 318 S.W.3d at 115.

## ANALYSIS

### 1. Was Skylar a member of an unmarried couple with a child in common?

The dispositive issue in this appeal is whether Skylar qualified for protection under the DVO statutes. KRS 403.725(1)(a) permits "[a] petition for an order of protection [to] be filed by . . . [a] victim of domestic violence and abuse[.]" KRS 403.720(1), in turn, defines "domestic violence and abuse" as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]" Because there is no allegation that Skylar and Jordan are family members as they were never married, Skylar must prove that she qualifies for protection under the DVO statutes as a "member of an unmarried couple." "[M]ember of an unmarried couple" is defined in KRS 403.720(5) as

-15-

"each member of an unmarried couple which *allegedly has a child in common*, any children of that couple, or a member of an unmarried couple who are living together or have formerly lived together[.]" (Emphasis added.)

Because there was no evidence presented to the family court that Skylar and Jordan were living together or had formerly lived together, this appeal centers upon the question of whether Skylar properly qualifies as a member of an unmarried couple under KRS 403.720(5) solely because she and Jordan allegedly have a child in common. Because we are persuaded that the facts of this case fit squarely into the first part of statutory definition of unmarried couple, we conclude that Skylar is entitled to the protections afforded by entry of a DVO. Skylar's testimony that she was about two months pregnant with Jordan's child constituted sufficient evidence from which the family court could conclude that Skylar and Jordan *allegedly* had a child in common, despite the fact that the child had yet to be born.

General principles of statutory construction compel this conclusion. "In construing a statute, it is fundamental that our foremost objective is to determine the legislature's intent in enacting the legislation." *Pearce v. University of Louisville, by and through its Board of Trustees*, 448 S.W.3d 746, 749 (Ky. 2014). "To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v.*

-16-

*Louisville/Jefferson County Metro Government*, 260 S.W.3d 777, 779 (Ky. 2008).

"*Further, we construe a 'statute only as written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous. . . .'" Pearce*, 448 S.W.3d at 749 (emphasis added) (citing *Western Kentucky Coal Co. v. Nall & Bailey*, 228 Ky. 76, 14 S.W.2d 400, 401-02 (1929)).

The Supreme Court in *Pearce* made clear that appellate courts are not free to "distort[] the meaning of the statute by ignoring essential words" *Id*. at 751. *Pearce* instructs that courts "must consider the entire [statutory] phrase and account for **all** of the words used in it." *Id*. (emphasis added). In reversing the Court of Appeals, the *Pearce* court held that "courts are not at liberty to ignore the legislature's use of the phrase the 'of the Commonwealth' to modify [the] word 'citizens[,]'" emphasizing that courts "are not free to use only the words that satisfy us, and ignore the words that do not suit our conception of what the law ought to be." *Id*.

Relying upon *Pearce*, we are convinced that the General Assembly's use of the word "allegedly" in KRS 403.720(5) cannot simply be ignored. Thus, the family court was free to accept Skylar's testimony alleging that she was two months pregnant with Jordan's child as evidence that she was a "member of an unmarried couple which *allegedly has a child in common*[.]" The Cambridge Online Dictionary defines the word "allegedly" as "something [] said to be true but

[which] has not been proved[.]" [4]  Skylar's statement on the DVO initiating form that she was pregnant with Jordan's child and her reiteration of that allegation in her testimony before the family court, in our view, fully satisfies the statutory requirement for DVO protection as a member of an unmarried couple which *allegedly* has a child in common.  Further, the fact that the child had not yet been born seems to present a situation which demonstrates the very purpose for the legislature's inclusion of the word "allegedly" in the statutory definition.  Had the child been born, it would have been subject to testing to prove or disprove paternity and there would be no need to use the term "allegedly."

We also emphasize that the family court was dealing with very serious allegations lodged by an unrepresented litigant.  As evidenced by his own words, Jordan's belief that he and Skylar apparently had a child in common precipitated the majority of his threats against her.  To reiterate some of the text messages previously set out:

> If you name the baby or do anything without my
> permission or without talking to me about it, ima be at
> your doorstep on mode.  And anybody you know can get
> it on god.
>
> I'm crazy, now I'm about to be a demon ass nigga.  Now
> you gonna see how crazy I am, I know where you live I
> will ruin yo life just like your ruining mine mf I will flip

---

[4] *Allegedly*, CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/allegedly (last visited Mar. 15, 2022).

yo car upside down go to jail get out and do it again.  I'M
REAL FUCXXXX CRAZY NOW U GON SEE ME MF.

I fuxxxxx dare you to try and keep me out of my child's
life.  If your thinking about it, and if you think I talk a lot
now trust me you ain't seen shit yet, I don't care about no
court or police or anything try some shit like that and I
promise you your going to regret that immediately.  You
literally make me want to put a gun to my head right
now, I'm gonna start flipping shit.

Any nixxx you date any nixxx u bring around my kid on
my brothers grave ima stomp et nixxxx face in.

But oh last thing ANY nigga you date marry etc
whatever ion want him anywhere near my child.  If he
even LOOKS at my child I PROMISE you I will beat the
snot out that nigga so bad everytime I see him he gon
wish I would just kill him.

And oh yea I fucking DARE you to try keep me out of
my child's life u think I talk a lot now trust me you ain't
seen shit yet idgaf about no court police of
anything try some shit like that and I PROMISE you, you
gon regret that shit immediately. That's the problem[.]

In addition to the quoted texts, Skylar alleged that Jordan had threatened her family

and mistreated her dog.  Perhaps most concerning in light of evidence presented to

the family court is Jordan's access to firearms.  On the basis of evidence before it,

we are convinced that the family court not only had jurisdiction but was bound to

enter an order of DVO protection for Skylar based upon her virtually

uncontradicted allegations.

In addition to our conclusion based upon the plain language of the statute, our conclusion finds support in the decision of our Supreme Court in *Smith v. Doe*, 627 S.W.3d 903, 909 (Ky. 2021): "[a]part from who may file a petition for an IPO or DVO, the statutes governing the respective protective orders read and operate in much the same way." Similarly, this Court held in *Calhoun v. Wood*, 516 S.W.3d 357, 360 (Ky. App. 2017), "[i]t appears the purpose and intent behind, and the interpretation of, the DVO statutes are almost identical to that of the IPO statutes." As previously noted, petitions for both DVOs and IPOs are filed using the same Administrative Office of the Courts form. The ruling of the issuing court is recorded on a form incorporating its decisions as to both DVOs and IPOs. It is undisputed that the family court's jurisdiction extends to rulings on either type of protective order. Accordingly, we ascribe no significance to the fact that this unrepresented petitioner checked the wrong box on the initiating form concerning her status with respect to Jordan.

Furthermore, this Court held in an unpublished opinion that paternity need not be proven in order to create a legal relationship which would warrant a protective order:

> Furthermore, we believe that to require so would create a conflict with the intent of the statutes to provide protective orders to those who are in need of them as well as a conflict of public policy. The trial court did not establish paternity but rather used **the allegation of**

-20-

> **paternity to establish sufficient grounds for the grant
> of protection**.

*Barrera v. Vega*,[5] No. 2006-CA-002211-MR, 2008 WL 540790, at \*2 (Ky. App.

Feb. 29, 2008) (emphasis added).

Finally in regard to Skylar's entitlement to DVO protection, we urge

our General Assembly to amend KRS 403.720(5) to remove any doubt as to its

intent to protect pregnant victims of domestic violence.  In response to an opinion

denying domestic violence protection to the mother of an unborn child, the

legislature of the state of New Jersey promptly amended its domestic violence

statute:

> In *Croswell v. Shenouda*, 275 N.J.Super. 614, 620, 646
> A.2d 1140 (Ch. Div. 1994), the trial court held that, for
> purposes of establishing a family-type relationship
> between parties, under the Domestic Violence Act, a
> fetus could not be considered a child-in-common of the
> parties in order to establish jurisdiction under the Act.  It
> is significant, however, that *Croswell* was decided on
> May 6, 1994.  Only three months later, on August 11,
> 1994, the New Jersey Legislature expressly expanded the
> jurisdictional parameters of the Domestic Violence Act,
> and supplemented the definition of a victim, to include
> any person "**who has been subjected to domestic
> violence by a person** . . . **with whom the victim
> anticipates having a child in common, if one of the
> parties is pregnant**."  N.J.S.A. 2C:25-19(d).  Further,
> this 1994 amendment may logically be considered in
> conjunction with the Act's 1991 Statement of Legislative
> Findings, in which the Legislature expressly found and

---

[5] This non-published opinion is cited not as authoritative precedent but merely as instructive as to a prior appellate interpretation of paternity in domestic violence situations.

> declared that "a significant number of women who are assaulted are pregnant." N.J.S.A. 2C:25-18. By reading the 1991 legislative statement and 1994 legislative amendment *in pari materia*, **one may reasonably conclude that our Legislature recognized a socially significant and special need to protect pregnant victims of domestic violence**.

*B.C. v. T.G.*, 430 N.J. Super. 455, 464-65, 65 A.3d 281, 286 (Ch. Div. 2013) (emphases added).

In sum, we are firmly convinced that the Jefferson Family Court acted within its jurisdiction in entering a DVO for the protection of Skylar and her unborn child.

**2. Did the family court err in awarding temporary custody of an unborn child?**

We now turn to that portion of the DVO which awarded Skylar temporary custody of her unborn child. Although awards of temporary custody are plainly provided for by the explicit terms of KRS 403.740(1)(d)(2), an award of temporary custody of a child for whom paternity cannot be established prior to birth is, in our opinion, premature. Importantly, an award of custody was not necessary to protect Skylar's unborn child prior to its birth as the DVO protecting Skylar protects her unborn child as well. Once the child is born, Skylar can petition the court to amend the order of protection to award temporary custody if the circumstances at that time so require.

Further, we note jurisprudence from other states holding that there can be no initial custody determination under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) until the birth of a child:

> The statute defines a "child" as "an individual who has not attained 18 years of age." 750 ILCS 36/102(2) (West 2014). The UCCJEA, however, does not "authorize jurisdiction over a child custody proceeding concerning an unborn child." *Waltenburg v. Waltenburg*, 270 S.W.3d 308, 316 (Tex.App.2008)[.]

*Fleckles v. Diamond*, 2015 IL App (2d) 141229, ¶ 36, 35 N.E.3d 176, 184 (Ill. App. Ct. 2015). In addition, KRS 403.800(4), the Kentucky version of the UCCJEA, defines "child custody proceedings" to include a proceeding seeking an order of protection:

> (4) "Child custody proceeding" means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and **protection from domestic violence**, in which the issue may appear. The term does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under Article 3[.]

(Emphasis added.) Like our sister states, we view the criteria set out in KRS 403.800 to 403.880 for making initial custody decisions as presupposing a child which has been born. For example, KRS 403.822(1)(a) references the "home state of the child on the date of the commencement of the proceeding[.]" Logic dictates

-23-

that an unborn child acquires a home state at the time of his or her birth.

Furthermore, the factors to be considered in selecting a temporary custodian presuppose a child that has been born: "[s]ubstantial evidence is available in this state concerning the *child's care, protection, training, and personal relationships*[.]" KRS 403.822(1)(b)(2). Finally, the UCCJEA predicates the acquisition of continuing, exclusive jurisdiction on the residence of the child's *parents*. KRS 403.824. The foregoing factors persuade us that the family court cannot acquire jurisdiction to make an initial award prior to the birth of the child and establishment of paternity.

In reaching this decision, we recognize that the UCCJEA provides for temporary emergency jurisdiction in KRS 403.828. However, the factors supporting jurisdiction under that statute again presuppose a child that has been born. In this regard, we emphasize that until the time of the child's birth, the order protecting Skylar protects her unborn child as well.

Accordingly, we conclude that the family court lacked jurisdiction to award Skylar temporary custody of her unborn child.

CONCLUSION

Accordingly, because we are convinced that the family court did not clearly err in concluding that Skylar's allegations were sufficient to satisfy the statutory definition for protection under the domestic abuse statute, we affirm that

-24-

portion of DVO protecting her and her unborn child from further acts domestic violence. That portion of the DVO which awarded Skylar temporary custody of the unborn child is reversed and the case remanded to the family court for entry of an amended DVO in conformity with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Abigail Green
Macauley Campbell
Miles Devon Skeens IV
Louisville, Kentucky

BRIEF FOR APPELLEE:

Dorislee Gilbert
Louisville, Kentucky